## PEABODY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 289.   Argued February 27, 1913.—Decided December 15, 1913.

The subjection of land to the burden of governmental use by constantly discharging heavy guns from a battery over it in time of peace in such manner as to deprive the owner of its profitable use would constitute such a servitude as would amount to a taking of the property within the meaning of the Fifth Amendment and not merely a consequential damage.

In order, however, to maintain an action for such a taking it must appear that the servitude has actually been imposed on the property.

A suit against the Government must rest on contract as the Government has not consented to be sued for torts even though committed by its officers in discharge of their official duties.

A contract with the Government to take and pay for property cannot be implied unless the property has been actually appropriated.

The mere location of a battery is not an appropriation of property within the range of its guns.

Where it appears that the guns in a battery have not been fired for more than eight years, and the Government denies that it intends to fire the guns over adjacent property except possibly in time of war, this court will not say that the Government has taken that property for military purposes.

46 Ct. Cls. 39, affirmed.

THE facts, which involve the determination of whether the establishment of a battery in connection with its military fortifications by the United States in the vicinity of claimants' land amounted under the circumstances of this case to a taking of property under the Fifth Amendment, are stated in the opinion.

*Mr. John Lowell,* with whom *Mr. William Frye White* and *Mr. Chauncey Hackett* were on the brief, for appellants:

The court below erred in not finding that the property of the claimant has been taken without just compensation where guns of a permanent battery established by the United States have been fired over and across the same; and where the guns are so fixed as to make it possible to do so in the future.

It also erred in not holding that under the circumstances of this case the property or a property right in the same has not been taken within the meaning of the Fifth Amendment and that the United States is liable for the value thereof.

It is impossible to fire the guns with safety except over the claimants' land.

The United States intended to fire the guns over the claimants' land in time of peace.

Property includes the collection of rights attaching to

the things or land. Those rights include rights of use, exclusion and disposition. It is these rights which constitute property and it is the interference with these rights which, if carried so far as to impair materially their value, constitutes a taking. *Old Colony R. R. Co.* v. *Plymouth*, 14 Gray, 155, 161; Hare on American Constitutional Law, 357; 1 Bentham's Works (1843), 308; *Morrison* v. *Semple*, 6 Binn. 94, 98; *Jackson* v. *Honsel*, 17 Johns. 281; *Chicago &c. R. R. Co.* v. *Englewood R. R. Co.*, 115 Illinois, 375, 385; *Denver* v. *Beyer*, 7 Colorado, 113; *St. Louis* v. *Hill*, 116 Missouri, 527; *Sinking Fund Cases*, 99 U. S. 700, 738; 1 Lewis on Eminent Domain, 3d ed., 51; 2 Austin's Jur. 1051.

As to what constitutes a taking, see Sedgwick, Const. Law, 2d ed., 456; 1 Lewis on Eminent Domain, 56; *Stockdale* v. *Rio Grande Ry. Co.*, 28 Utah, 201, 211; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; 1 Hare on Amer. Const. Law, 388; *United States* v. *Lynah*, 188 U. S. 445; *Chappell* v. *United States*, 34 Fed. Rep. 673; *S. C.*, 160 U. S. 499; *Eaton* v. *B. C. & M. R. R. Co.*, 51 N. H. 504, 511; *Grand Rapids Booming Co.* v. *Jarvis*, 30 Michigan, 308, 321; *Thompson* v. *Androscoggin Imp. Co.*, 54 N. H. 545.

When the United States acquires the fee of the land over which the right of way goes, that is a taking of the right of way. *United States* v. *Welch*, 217 U. S. 338.

Where a part only of claimant's land was flooded, besides the market value of the land flooded, just compensation includes damage to the remaining land resulting from such taking. *United States* v. *Grizzard*, 219 U. S. 180. Nor is *Sharp* v. *United States*, 191 U. S. 341, in conflict, for that case went off on the ground that the depreciation occurred to a distinct tract of land. Compare *United States* v. *Alexander*, 148 U. S. 186; *Sprague* v. *Dorr*, 185 Massachusetts, 10.

See also 15 Cyc. 660, note 41; and *Ib.*, pages 661–670, inclusive, and notes.

Claimants' property has been taken.

It cannot possibly be said that with this menace constantly threatening the claimants' land, materially and permanently impairing its value, their rights of use, exclusion and disposition, have not been so seriously interfered with as to constitute a taking.

The claimants' land extends in contemplation of law *usque ad cœlum.* Co. Litt. 4a; 2 Bla. Com. 18; 3 Kent Com. 401; Webb's Pollock on Torts, p. 423; *Lyman* v. *Hale,* 11 Connecticut, 546; *Wandsworth* v. *Tel. Co.,* 13 Q. B. Div. 912; *Humphries* v. *Brogden,* 12 Q. B. 739; *Haines* v. *Roberts,* 6 El. & Bl. 643; 7 El. & Bl. 625; Erskine's Inst. Laws Scotland, Book ii, title 9, § 11; 1 American Law Reg. (N. S.) 577; *Lemmon* v. *Webb,* 1 App. Cases (1895), 1; *Corbett* v. *Hill,* L. R. 9 Eq. 671.

The property of the claimants consisted of the rights of user, exclusion and disposition. So far as they are concerned, these rights have been greatly impaired, in fact have become valueless. The Court of Claims has found that this impairment of the value of the property will continue so long as the fort and artillery therein are maintained. The United States is in the enjoyment of the greater part of these rights. It is clear, therefore, that the United States has taken the claimants' property within the meaning of the Fifth Amendment.

The decision of the Court of Claims is wrong. *Emerson* v. *Taylor,* 9 Maine, 42, relied on below, does not apply, as the acts complained of in that case did not constitute a taking within the meaning of the Fifth Amendment.

*Transportation Co.* v. *Chicago,* 99 U. S. 635; *Gibson* v. *United States,* 166 U. S. 269; *Scranton* v. *Wheeler,* 179 U. S. 141; *Bedford* v. *United States,* 192 U. S. 217, relied on by the Government as holding that the acts complained of did not constitute a taking within the meaning of the

Fifth Amendment are also clearly distinguishable. See *United States* v. *Lynah*, 188 U. S. 445.

The claimants' property has been taken: the United States has taken title to the whole of the claimants' property commanded by the guns by acquiring the value thereof and assuming dominion thereof *in perpetuo.*

The findings show that the land was of little value except as a summer resort, and that it can no longer be used for such purpose.

This is not a case of loss of access, nor a case where the land was subject to a servitude in favor of the United States; nor a case where the damage was consequential.

It is a case where upon the firing of the guns the United States took the valuable use of the land and thereby virtually, though not formally, has appropriated the title as well.

*Mr. Frederick De C. Faust,* with whom *Mr. Assistant Attorney General Thompson* was on the brief, for the United States:

Appellants, as record owners, are estopped from asserting that the property has been taken.

Appellants' fundamental proposition to establish the taking rests upon a false premise.

There has been no taking of appellants' property within rule established by decisions of this court.

The injury of which appellants complain is consequential, for which no right of compensation attaches.

In support of these contentions, see *Bedford* v. *United States,* 192 U. S. 224; *Benner* v. *Atlantic Dredging Co.,* 134 N. Y. 156; *Beseman* v. *R. R.,* 50 N. J. L. 235; *Booth* v. *R. R. Co.,* 140 N. Y. 262; *Carroll* v. *R. R. Co.,* 40 Minnesota, 168; *Chicago R. R. Co.* v. *Drainage Comrs.,* 200 U. S. 561; *Chappell* v. *United States,* 34 Fed. Rep. 673; *Dist of Col.* v. *Barnes,* 197 U. S. 146; *Eaton* v. *Boston R. R.,* 51 N. H. 504; *Emerson* v. *Taylor,* 9 Maine, 42; *Gibson* v. *United States,*

166 U. S. 269; *Hay* v. *Cohoes Co.,* 2 N. Y. 159; *Heyward* v. *United States,* 46 Ct. Cls. 484; *Hurdman* v. *R. R. Co.,* L. R. (3 C. P. Div.) 168; *Lansing* v. *Smith,* 8 Cowen, 146; *McClure* v. *United States,* 116 U. S. 145; *Manigault* v. *Springs,* 199 U. S. 473; *Monongahela Nav. Co.* v. *Coons,* 6 Watts & S. 101; *Peabody* v. *United States,* 43 Ct. Cls. 19; *Portsmouth Land Co.* v. *Swift,* 82 Atl. Rep. 524; *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166; *Radcliff* v. *Brooklyn,* 4 N. Y. 195; *Scranton* v. *Wheeler,* 179 U. S. 141; *Sisseton Indians* v. *United States,* 208 U. S. 566; *Sharp* v. *United States,* 191 U. S. 341; *St. Peter* v. *Dennison,* 58 N. Y. 416; *Stevens* v. *Paterson R. R.,* 34 N. J. L. 549; *Transportation Co.* v. *United States,* 99 U. S. 642; *Tremain* v. *Cohoes Co.,* 2 N. Y. 163; *Union Bridge Co.* v. *United States,* 204 U. S. 361; *United States* v. *Adams,* 6 Wall. 112; *United States* v. *Grizzard,* 219 U. S. 180; *United States* v. *Lynah,* 188 U. S. 445; *United States* v. *Sewell,* 217 U. S. 601; *United States* v. *Welch,* 217 U. S. 338.

MR. JUSTICE HUGHES delivered the opinion of the court.

This is an appeal from a judgment of the Court of Claims dismissing petitions for compensation for land alleged to have been taken by the United States for public use. 46 Ct. Cls. 39. Separate suits were brought by Samuel Ellery Jennison, the owner at the time the taking is said to have occurred, by his mortgagees, Mary R. Peabody and the Saco and Biddeford Savings Institution, and by his grantee, the Portsmouth Harbor Land and Hotel Company. These suits were consolidated and the merits were heard. The following facts are shown by the findings:

The land in question, comprising about two hundred acres, forms the southern corner of Gerrish Island, the southernmost point on the coast of Maine. It lies about three miles from Portsmouth, bordering on the south and

east the Atlantic ocean and on the west the entrance to Portsmouth harbor. Its value consists almost entirely in its adaptability for use as a summer resort and it had been improved for this purpose by the erection of a hotel, cottages, outbuildings and pier, by the construction of roads, and by the provision of facilities for summer recreations.

In 1873, long before Jennison acquired title and improved the property, the United States began the construction of a twelve-gun battery upon a tract of seventy acres lying north and west of the land in suit and abutting upon it. This battery was to be one of the outer line of defenses of Portsmouth harbor, for which appropriation had been made by the act of February 21, 1873, c. 175, 17 Stat. 468. (See also act of April 3, 1874, c. 74, 18 Stat. 25.) By the year 1876, a large sum had been expended upon the work which had reached an advanced stage of construction. Operations were closed in September of that year, however, for want of funds and the fortification was not occupied by the United States thereafter until work was resumed in 1898. The Government then constructed on the same site a battery consisting of three ten-inch guns and two three-inch rapid fire guns. It was practically completed on June 30, 1901, and was transferred to the artillery on December 16, 1901, being named Fort Foster.

No part of the fort encroaches upon the land in suit; the fort is within two hundred feet of its northwestern corner and about one thousand feet from the hotel. The claimants' land lies between the fort and the open sea to the south and southeast; and the guns have a range of fire over all the sea-front of the property. As the government reservation on its western side borders the entrance to the harbor, the court found that there was an available portion of the shore belonging to the reservation which permitted the firing of the guns in a southwesterly direc-

.tion "for practice and for all other necessary purposes in time of peace" without the projectiles passing over the land in question. This conclusion was reached by applying the local law governing the boundary lines of contiguous proprietors where there is a curvature of the shore. *Emerson* v. *Taylor*, 9 Maine, 42. It may be noticed here that the petitioners insist that the guns could not be fired over the narrow area thus found to be a part of the reservation without endangering life and property along the New Hampshire coast and they present in their brief a map to support their assertion. The Government urges that this map has not been identified and is wholly incompetent; and that, as the question is one of fact, the finding must be deemed conclusive. But while thus finding that there was a line of fire available to the Government over its own shore property, the court also found that the most suitable field of fire for practice and other purposes in time of peace would be over the claimants' land.

On or about June 22, 1902, two of the guns were fired for the purpose of testing them at a target off the coast, the missiles passing over the land in suit; and another gun was fired for the same purpose and to the same effect on September 25, 1902, the resulting damage to buildings and property amounting to $150.

None of the guns has been fired since, but they have been kept in good condition by a detail from Fort Constitution which is situated across the Piscataqua River. The court below further states in its findings that "it does not appear from the evidence that there is any intention on the part of the Government to fire any of its guns now installed, or which may hereafter be installed, at said fort in time of peace over and across the lands of the claimants so as to deprive them of the use of the same or any part thereof or to injure the same by concussion or otherwise, excepting as such intention can be drawn from the fact that the guns now installed in said fort are so fixed as to make it possible

so to do and the further fact that they were so fired upon the occasions as hereinbefore found."

In the years 1903 and 1904, the hotel which had previously been profitable was conducted at a loss; since 1904, it has been closed and the cottages have been rented only in part and at reduced rates. It is found that the erection of the fort and the installation of the guns have materially impaired the value of the property and that this impairment will continue so long as the fort and artillery are maintained. This is found to be due to the apprehension that the guns will be fired over the property.

The question is whether upon this showing the petitioners were entitled to recover.

It may be assumed that if the Government had installed its battery, not simply as a means of defense in war, but with the purpose and effect of subordinating the strip of land between the battery and the sea to the right and privilege of the Government to fire projectiles directly across it for the purpose of practice or otherwise, whenever it saw fit, in time of peace, with the result of depriving the owner of its profitable use, the imposition of such a servitude would constitute an appropriation of property for which compensation should be made. The subjection of the land to the burden of governmental use in this manner might well be considered to be a 'taking' within the principle of the decisions (*Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, 177, 178; *United States* v. *Lynah*, 188 U. S. 445, 469; *United States* v. *Welch*, 217 U. S. 333, 339) and not merely a consequential damage incident to a public undertaking which must be borne without any right to compensation (*Transportation Co.* v. *Chicago*, 99 U. S. 635, 642; *Gibson* v. *United States*, 166 U. S. 269; *Scranton* v. *Wheeler*, 179 U. S. 141, 164; *Bedford* v. *United States*, 192 U. S. 217, 224; *Jackson* v. *United States*, 230 U. S. 1, 23).

But, in this view, the question remains whether it satis-

factorily appears that the servitude has been imposed; that is, whether enough is shown to establish an intention on the part of the Government to impose it. The suit must rest upon contract, as the Government has not consented to be sued for torts even though committed by its officers in the discharge of their official duties (*Gibbons* v. *United States*, 8 Wall. 269, 275; *Langford* v. *United States*, 101 U. S. 341, 343; *Schillinger* v. *United States*, 155 U. S. 163, 169; *Russell* v. *United States*, 182 U. S. 516, 530; *Harley* v. *United States*, 198 U. S. 229, 234); and a contract to pay, in the present case, cannot be implied unless there has been an actual appropriation of property (*United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645, 656, 657).

The contention of the petitioners, therefore, is plainly without merit so far as it rests upon the mere fact that there is a suitable, or the most suitable, field of fire over their property. Land, or an interest in land, cannot be deemed to be taken by the Government merely because it is suitable to be used in connection with an adjoining tract which the Government has acquired, or because of a depreciation in its value due to the apprehension of such use. The mere location of a battery certainly is not an appropriation of the property within the range of its guns.

The petitioners' argument assumes that the guns, for proper practice, must be fired over the land in suit and, hence, that this burden upon it was a necessary incident to the maintenance of the fort. The fact of the necessity of practice firing is said to be established by the finding with respect to the line of fire over the Government's portion of the shore in which it is said that this would be sufficient "for purposes of practice and for all other necessary purposes in time of peace." But, in the light of other findings, this is far from affording a sufficient foundation for the conclusion upon which the petitioners insist. On the contrary, that no such necessity as is now asserted can be assumed from the mere fact that the fort is main-

tained is demonstrated by the facts of this case. This suit was tried in the latter part of the year 1910 and it appeared that none of the guns had been fired for over eight years. When the suit was brought in 1905, nearly two years and a half had elapsed since the firing of a shot. The guns have been fired only upon two occasions, or three times in all, and this firing took place in 1902, shortly after the installation of the guns, for the purpose of testing them. It may be that practice in firing the guns would be highly desirable, but it is too much to say upon this record that the fort would be useless without it. Nor are we at liberty to conclude that the Government has taken property, which it denies that it has taken, by assuming a military necessity in the case of this fort which is absolutely contradicted by the facts proved.

Reduced to the last analysis, the claim of the petitioners rests upon the fact that the guns were fired upon the two occasions in 1902, as stated, and upon the apprehension that the firing will be repeated. That there is any intention to repeat it does not appear but rather is negatived. There is no showing that the guns will ever be fired unless in necessary defense in time of war. We deem the facts found to be too slender a basis for a decision that the property of the claimants has been actually appropriated and that the Government has thus impliedly agreed to pay for it.

The judgment is affirmed.

*Affirmed.*