### NORTH COUNTIES HYDRO-ELECTRIC CO. v. UNITED STATES.
No. 46274.
Court of Claims.
April 7, 1947.

Edmund D. Adcock, of Chicago, Ill., for plaintiff.

Marvin J. Sonosky, of Washington, D. C., and David L. Bazelon, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

In 1925 plaintiff built a hydro-electric power plant on the Fox River near Dayton, Illinois, about 5¾ miles above where the Fox River empties into the Illinois River. In 1933 defendant built a lock and dam at a place called Starved Rock[1] on the Illinois River about eight miles below the mouth of the Fox River. The back water from this dam backs up into the Fox about 2½ miles, which is about 3 miles below plaintiff's powerhouse.

Ten years after defendant's dam had been completed an ice jam formed on the Fox River below plaintiff's dam. The accumulation of slush ice behind this jam finally reached plaintiff's powerhouse, flooding it and putting it out of commission on March 3, 1943. This condition continued until April 16, 1943.

Plaintiff says that this ice jam and the flooding of its powerhouse was caused by the erection of defendant's dam at Starved Rock in 1933, that it is "probable" that there will be other jams which will flood its powerhouse and that, therefore, it is entitled to recover for the impairment of the value of its plant under the Fifth Amendment to the Constitution.

For several reasons we do not think plaintiff is entitled to recover. We shall state two.

First. We do not think plaintiff has carried the burden of showing that the erection of the Starved Rock dam caused the ice jam that backed up into plaintiff's plant. Plaintiff's theory is that the erection of this dam caused a pool of comparatively still water in the Fox River, which was more apt to freeze over than running water. It says this pool did freeze over and that the slush ice coming down the river dammed up against the ice on this pool until its accumulations finally extended three miles up the river and into its plant. The formation of the pool, plaintiff says, was the thing that caused the ice jam.

The witness by whom plaintiff seeks to prove this was H. M. MacGrogan, its plant superintendent, whose testimony, it was agreed, would have been corroborated by two of its other employees had they been called to the stand. MacGrogan says that between the first of January and the latter part of February he observed the ice in the Fox River from four different points: (1) The bridge over the Fox River at United States Highway No. 6, which is about a mile above its mouth; (2) a point on the bank of the Fox River several hundred yards above this highway bridge; (3) from a place on the highway at the Chicago Retort & Fire Brick Company several hundred feet from the river bank; and (4) from the highway bridge about 400 feet below the plaintiff's powerhouse. We are of opinion that his means of observation from these points were not sufficient to enable

---

[1] This is a fortress-like rock about a half acre in size at its top, with a sheer drop of 140 feet to the river below. The story is that a band of Indians trapped and surrounded a rival band on the top of this rock and starved them into submission; hence, the name "Starved Rock."

him to give satisfactory testimony as to what caused the ice jam.

The Fox River is a shallow stream from 2 to 5 feet deep. Its course between its mouth and plaintiff's dam is quite tortuous. About two miles below plaintiff's dam there are three small islands in the middle of the river. From here on to its mouth there are two particularly sharp bends and two others not quite so sharp. The first bend, coming down river from plaintiff's plant, is in the form of the letter **U**; the second, an inverted **U**; the third one, a **U** elongated at the top; and the last, an inverted **U**, also elongated at the top. At the bottom of the first bend, which is about opposite the plant of the Chicago Retort & Fire Brick Company, there is an island in the middle of the river about 900 feet long. About 2,200 feet farther downstream, and before the top of the next bend is reached, there is another island in the middle of the river about 1,400 feet long.

From the first two points of observation MacGrogan was unable to observe the river upstream beyond the second bend. From his third point of observation, from the highway opposite the Chicago Retort & Fire Brick Company, he could only see the river immediately in front of him, and that not well enough to testify accurately as to the condition of the ice. From the fourth point of observation on the highway bridge, about 400 feet below the dam, he could see the river for only about half a mile downstream.

Thus it is seen that MacGrogan was unable to testify as to the ice condition in the river around the first and second bends, in which there were these two large islands. His opportunity to observe the condition from the highway opposite the Chicago Retort & Fire Brick Company was quite limited, and he has no information at all as to the state of the river between this bend and about a half mile below the dam, which is a distance of about two miles. He is, therefore, unable to testify definitely that this ice jam began at the pool formed by the Starved Rock dam and extended all the way up to plaintiff's power plant.

He did testify definitely that he saw sheet ice and an accumulation of slush ice from the bridge at U. S. Highway No. 6, and he testified definitely that he saw an ice jam forming below the bridge adjacent to the powerhouse. This, however, leaves unaccounted for a stretch of water between the two, about three miles long, in which there were several objects capable of causing an ice jam: (1) the three islands about two miles below the dam; (2) the two bends in the river; and (3) the two large islands in the bends of the river.

The witness was unable to say whether the jam started at these three small islands, or at the islands in the bends of the river, or at the bends themselves, all of which were above the backwater formed by the Starved Rock Dam.

■ We do not think plaintiff has carried the burden of showing that the erection of the Starved Rock Dam caused the ice jam which flooded its plant. We think the commissioner was justified in finding: "The proof is insufficient to show that the ice jam which caused injury and damage to plaintiff's plant began at the backwater in the Fox River, and then extended all the way up to plaintiff's plant." We have, accordingly, adopted this as a part of our findings of fact.

Second. The commissioner has also found:

"Whether there will be a periodical recurrence of the 1943 ice condition resulting in permanent damage to plaintiff's property is purely speculative."

Plaintiff excepts to this and asks us to find the following in lieu thereof:

"It is probable that an ice condition similar to the 1943 gorge will occur once every ten or twelve years causing damage to plaintiff's plant * * *."

In support of this suggested finding we are cited to the testimony of Horace P. Ramey, a civil engineer and assistant chief engineer of the Sanitary District of Chicago. Ramey is asked:

"When you say it might happen, [referring to the ice jam] do you mean exactly that way, or as to the probability of happening?"

He answered:

"Well, it did happen, and you might get the same climatological conditions again,

which would cause it to happen. So it is speculative, but it did happen once in twelve years. I also heard testimony about a similar jam in January, 1946.[2] I firmly believe that it can happen."

He further said:

"I think it probably will happen at some future time, and my best estimate is that it probably will happen, say, once in twelve years."

 This falls far short of the rule stated in United States v. Cress, 243. U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746, upon which plaintiff relies, of a "permanent liability to intermittent but inevitably recurring overflows." The proof is entirely insufficient to show that it is inevitable for these ice jams to recur. Instead of their being inevitable, plaintiff's witness testifies that whether or not it will happen is speculative, although he says he thinks it will happen.

 It is clear under the authorities that the flooding of an owner's land on but one occasion does not constitute a taking. Before there can be a taking a servitude must have been imposed upon the land, that is to say, a subjection of the land for a more or less definite time to a use inconsistent with the rights of the owner. Peabody v. United States, 231 U.S. 530, 34 S. Ct. 159, 58 L.Ed. 351; Portsmouth Harbor Land & Hotel Co. v. United States, 250 U.S. 1, 39 S.Ct. 399, 63 L.Ed. 809; Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S. Ct. 135, 67 L.Ed. 287; Sanguinetti v. United States, 264 U.S. 146, 149, 44 S.Ct. 264, 68 L.Ed. 608; United States v. Causby et al., 328 U.S. 256, 66 S.Ct. 1062. Cf. Camp Far West Irrigation District v. United States, 107 Ct. Cl. ——, 68 F.Supp. 908.

In Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 328, 329, 43 S. Ct. 135, 136, 67 L.Ed. 287, the court, speaking of Peabody v. United States, supra, and Portsmouth Harbor Land & Hotel Co. v. United States, 250 U.S. 1, 39 S.Ct. 399, 63 L.Ed. 809, said:

"* * * In the first case it was decided that the mere erection of the fort and the fact that guns were fired over the claimants' land upon two occasions about two years and a half before the suit was brought, coupled with the *apprehension* that the firing would be repeated, but with no proof of intent to repeat it other that the facts stated, did not require the finding of an appropriation and a promise to pay by the United States. The second case was like the first except for 'some occasional subsequent acts of gun fire,' 250 U.S. 2, 39 S.Ct. 399, 63 L.Ed. 809, and finding of the Court of Claims for the United States again was sustained." ·[Italics ours.]

The court further said:

"* * * There is no doubt that a serious loss has been inflicted upon the claimant, as the public has been frightened off the premises by the imminence of the guns; and while it is decided that that and the previously existing elements of actual harm do not create a cause of action, it was assumed in the first decision that—'if the Government had installed its battery, not simply as a means of defense in war, but with the purpose and effect of subordinating the strip of land between the battery and the sea to the right and privilege of the Government to fire projectiles directly across it for the purpose of practice or otherwise, *whenever it saw fit,* in time of peace, with the result of depriving the owner of its profitable use, the imposition of such a servitude would constitute an appropriation of property for which compensation should be made.' 231 U.S. at page 538, 34 S.Ct. 159, 58 L.Ed. 351. That proposition we regard as clearly sound." [Italics ours.]

The parties disagree as to whether or not the Fox River is navigable, but we think this is immaterial, and we have made no finding on this fact. Whether navigable or not, we do not think plaintiff is entitled to recover. Its petition will be dismissed. It is so ordered.

MADDEN, JONES, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.

---

[2] This jam did not reach plaintiff's plant.