Byron CRAVENS and Thelma Cravens,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Owen A. TOMLINSON and Louise Tomlinson, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Leon SHIGLEY and Syble Shigley,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

County of Logan, State of Arkansas,
Third-Party Defendant.

Civ. A. Nos. 1358–1360.

United States District Court
W. D. Arkansas,
Ft. Smith Division.

June 23, 1958.

J. H. Evans, Booneville, Ark., for plaintiffs.

Chas. W. Atkinson, U. S. Atty., Robert L. Johnson, Asst. U. S. Atty., Ft. Smith, Ark., for the United States.

Luke Arnett, Little Rock, Ark., Ray Blair, Paris, Ark., for Logan County, Ark.

JOHN E. MILLER, District Judge.

### Statement

These three actions involve similar fact situations and were consolidated for trial. In each case plaintiffs contend that they are property owners, and that in the spring of 1957 all access to their property was cut off for a period of approximately one month by the waters of Blue Mountain Lake, a lake created by the Government's construction of Blue Mountain Dam on Petit Jean River near the boundary line between Logan County and Yell County, Arkansas. Plaintiffs contend that in the future their only access road, a county road, will be subject to permanent intermittent overflows which will again cut off plaintiffs' access to their property.

In each of the cases the defendant, United States of America, pleads the statute of limitations. In Civil Action No. 1358 the defendant also relies upon the defense of res judicata, and in Civil Actions Nos. 1359 and 1360 said defendant contends that the plaintiffs are not the proper parties to bring the actions.

In each of the cases the Government has filed third-party complaints against Logan County, Arkansas, alleging that in the event plaintiffs recover against defendant, defendant in turn is entitled to recover against the county under an indemnity agreement.

Upon these issues the cases were tried to the court without a jury on June 3, 1958, and at the conclusion of the trial the Court took the cases under advisement. The Court has had an opportunity to give thorough consideration to the pleadings, evidence introduced at the trial, and briefs of the parties, and now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

### Findings of Fact

*Findings of Fact Relating to Plaintiffs' Claims against the Defendant*

1.

Each of the plaintiffs is a citizen and resident of the Fort Smith Division of the Western District of Arkansas. The defendant is the United States of America, and the third-party defendant is the

County of Logan, State of Arkansas. This is an action by the plaintiffs against the Government under the Tucker Act, 28 U.S.C.A. § 1402 et seq.

### 2.

On February 9, 1939, the plaintiff, Byron Cravens, purchased 158 acres of land in Logan County, Arkansas, the title being taken in his name only. On January 11, 1951, the plaintiffs, Byron Cravens and Thelma Cravens, purchased an additional seven acres adjacent to the original 158 acres, and title was taken in their names as tenants by the entirety. The land was and is intersected by a county road known as the Bethel Church Road.

On November 30, 1954, the plaintiffs, Owen A. Tomlinson, and Louise Tomlinson, as tenants by the entirety, purchased 160 acres a short distance east of the Cravens property, said land being intersected by the Bethel Church Road.

On July 28, 1956, plaintiffs, Leon Shigley and Syble Shigley, entered into a contract to purchase 60 acres of land southeast of the Tomlinson property. A deed was made by the property owners to Charles I. Evans as security for the purchase price which was furnished by Evans. As soon as Evans is repaid the purchase price, he is obligated to convey the property to the Shigleys, and in the meantime they are to have the beneficial ownership and possession of the property. The Shigley property is not directly adjacent to the Bethel Church Road, but the property is reached by a private road leading from the Bethel Church Road.

### 3.

The Bethel Church Road, above referred to, is a county road and is the only road furnishing ingress and egress to the Cravens, Tomlinson, and Shigley properties. Bethel Church Road runs in a generally east-west direction, and shortly west of the Cravens property there is a low point in the road and two culverts, less than 100 yards apart. The elevation at this point is 418.2 feet. Prior to the spring of 1957 the road at this point had never been inundated by the waters of Blue Mountain Lake. On occasions in time of heavy rain the road would be covered by water for short periods of time, ordinarily not exceeding one hour, but this was not water from the lake.

East of the Cravens, Tomlinson, and Shigley properties the Bethel Church Road crosses Crow Creek, and at that point the road has an elevation of 405 feet. The Bethel Church Road at Crow Creek has been inundated by the waters of Blue Mountain Lake on various occasions.

### 4.

Blue Mountain Dam was completed in 1947, and was so constructed that the spillway is 419 feet above mean sea level. The first time the water was permitted to run over the spillway was in the spring of 1957. The water began running over the spillway on May 23, 1957, and on that day the river stage was 419.-65 feet. The water remained at an elevation in excess of 419 feet until June 18, 1957, when the elevation was 418.90 feet. The high point was reached on May 26 when the elevation was 422.54 feet. On June 19 the elevation was 418.50 feet; June 20, 418.05 feet; June 21, 417.60 feet; June 22, 417.18 feet.

As heretofore stated, the elevation at the low point west of the Cravens property is 418.2 feet, and the elevation at Crow Creek, east of the three properties, is 405 feet. Thus, from May 23, 1957, until June 19, 1957, both Crow Creek and the low point west of the properties were inundated by the waters of the lake. During that time it was impossible for vehicles to travel on the Bethel Church Road across Crow Creek or across the low point west of the properties. In fact, the water reached a depth of approximately 4½ feet at the low point west of the Cravens property and was at an even greater depth at the Crow Creek crossing. At the point west of the Cravens property the water covered the road for a distance of approximately 150 yards. During most of the time the road was inundated at the two points above

mentioned, the only way plaintiffs could reach their property from the outside or reach the outside from their property was to use a boat; wade acoss the water; walk or ride a horse across property to the north to reach the Hog Thief Valley Road (which runs in an east-west direction about three-quarters of a mile north of the Bethel Church Road); or ride a tractor across a field owned by other people to the north. During the last week of the flooding some of the plaintiffs were able to reach the Hog Thief Valley Road by means of an old logging road over private property.

Of course, the flooding of the road caused great inconvenience to the plaintiffs. For example, the plaintiff Cravens was in the farming, livestock and trucking business and operated three trucks. During the flooding one of his trucks was trapped at his home and the other two trucks were trapped outside the flooded area. At the same time, his son was home on a Navy leave, and his son's car was trapped inside the flooded area. When the leave was up, the son was forced to leave the car at his father's home. The plaintiff Shigley's automobile was trapped outside the flooded area, and he was forced to leave it parked on the Hog Thief Valley Road and walk back and forth to the automobile from his home, a distance of approximately a mile and a half. Some of the plaintiffs had cattle, and it was very difficult to obtain feed for them. The ordinary mail service was discontinued. Luckily, school had just let out for the summer, and the flooding did not disrupt the schooling of plaintiffs' children. In addition to the above, there were many other inconveniences suffered by plaintiffs as a result of the flooding of the access road.

Not only was the Bethel Church Road inundated at the low point west of the Cravens property, but also approximately 1½ acres of the Cravens land was inundated.

5.

The Corps of Engineers has records from 1916 to date with reference to elevations of the river. The elevation of 419 feet has been reached in four years— 1927, 1935, 1945, and 1957. In the future it reasonably can be expected that the water elevation will exceed 419 feet approximately once each ten years.

6.

The Cravens property, containing 165 acres, has about 120 acres of grassland and 45 acres of timberland. It has a nice modern home, large cement-block garage, two barns, and a well house, and is generally in good condition. The fair market value of the property, prior to the flooding of the access road, was $18,000. Subsequent to June 1957 the value of the property, subject to the easement created by the subjection of the property to the results of the permanent intermittent overflows of the access road in the future, was $15,500. Thus the Cravenses were damaged in the sum of $2,500.

7.

The Tomlinson property, containing 160 acres, has about 80 acres of grassland and 80 acres of timberland. The Tomlinsons purchased the property when it was in a rundown condition, and have done a considerable amount of work in improving the property. Additional rooms were built on the house and a large broiler house was constructed. The fair market value of the property, prior to the flooding of the access road, was $11,000. Subsequent to June 1957 the value of the property, subject to the easement created by the subjection of the property to the results of the permanent intermittent overflows of the access road in the future, was $9,400. Thus the Tomlinsons were damaged in the sum of $1,600.

8.

The Shigley property contains 60 acres and a farm house that is not modernized. The fair market value of the property prior to the flooding of the access road was $3,000. Subsequent to June 1957 the value of the property, subject to the easement created by the subjection of the property to the results of the permanent intermittent overflows of the access road in the future, was $2,400. Thus the

Shigleys were damaged in the sum of $600.

9.

The United States had obtained a flowage easement from Logan County, Arkansas, covering the county roads within the boundary of the dam and reservoir area. This easement was recorded in the Northern District of Logan County, Arkansas. All the plaintiffs reside in the Southern District of Logan County, Arkansas, and the easement was not filed or recorded in that district. The plaintiffs, at the time they acquired their properties, had no notice of the Government's flowage easement.

Prior to the spring of 1957 the plaintiffs did not know and had no reason to believe that the waters of Blue Mountain Lake would inundate the Bethel Church Road at the low point or branch west of the Cravens property.

10.

The plaintiff, Byron Cravens, had previously filed a case in this Court, Civil No. 1136, seeking to recover damages for the impairment of his access roads. At the time of the prior suit the Bethel Church Road at Crow Creek had been inundated by the waters of the lake, but the road at the low point west of the Cravens property was not inundated by the lake waters. Certain other roads in the area were also inundated by the lake waters, and Cravens was required to travel on the Hog Thief Valley Road, which was and is a relatively inferior road. The Court held that the Government was not liable because of the inconvenience caused by the inundation of the shortest and best route from Cravens' property to surrounding towns, and that the access to Cravens' land was not taken within the meaning of the Tucker Act. The Court sustained a motion to dismiss filed by the Government at the close of Cravens' evidence. The judgment of the Court was dated January 20, 1955.

*Findings of Fact Relating Particularly to the Third-Party Complaint of the Defendant Against Logan County, Arkansas.*

11.

On February 5, 1948, the United States and Logan County, Arkansas, acting through the County Judge, M. B. Hardwicke, entered into a "Contract for Relocation, Rearrangement and Flooding of Certain Logan County, Arkansas, Roads," said contract being numbered W–03–050–eng–596. Among other things the contract provides:

"Whereas, the County has constructed and is maintaining the system of county roads for public highway traffic and other uses, certain parts of which will be inundated by the operation of the project by the Government; and

"Whereas, the County is agreeable to the relocation of certain of those roads within the reservoir area and is further agreeable to granting to the Government a flowage easement over and across all roads, bridges, approaches and fills belonging to Logan County located or to be located within the boundary of the reservoir area.

"Now, therefore, the parties do mutually agree as follows:

"Article I

"Obligations of the Government

"1. The Government agrees that it will:

"a. Pay the monetary consideration of $72,400.00 to the Contractor upon execution and delivery of a flowage easement, copy of which is attached hereto and marked Exhibit 'B'.

\* \* \* \* \* \*

"Article II

"Obligations of the Contractor

"1. The County Judge, acting for and on behalf of the contractor, will:

"a. Furnish all services, labor, materials, tools and equipment nec-

essary for the following-described construction work:

"Item A—Magazine-Sugar Grove Road.

&ast; &ast; &ast; &ast; &ast; &ast;

"Item B—Side Road—Magazine-Sugar Grove Road.

&ast; &ast; &ast; &ast; &ast; &ast;

"Item C—Sugar Grove-Booneville Road.

&ast; &ast; &ast; &ast; &ast; &ast;

"Item D—Sugar Grove Logan-Yell County Line Road.

&ast; &ast; &ast; &ast; &ast; &ast;

"b. The contractor warrants and agrees that the consideration named herein shall be used by him, his successors or assigns, solely for the construction, relocation, maintenance, or improvement of the above-mentioned roads, bridges, approaches, and fills, together with such other road work in Logan County, Arkansas, necessitated by the construction of the Blue Mountain Dam.

"c. Execute and deliver to the Government a flowage easement attached hereto as Exhibit 'B', upon receipt of the consideration named therein.

"d. Accept the terms and conditions of the easement and license to be granted by the Government.

"e. Procure all necessary court orders in the County of Logan, State of Arkansas, to carry out the terms and conditions of this contract.

"f. In consideration of the sum named in this contract, the contractor shall hold and save the Government, its officers, agents, and employees harmless from liability of any nature or kind, for or on account of any claim for damages which may be filed or asserted by third persons, as a result of the work to be performed by the Contractor hereunder, or on account of the permanent or temporary inundation of the roads, bridges, approaches, and fills, and for damages of every kind and nature, direct and indirect, to said roads, bridges, approaches, and fills, as a result of the operation of the reservoir."

On April 21, 1948, the flowage easement was executed by the County, through the County Judge, providing among other things:

"Witnesseth, that the party of the first part, as County Judge, for and in consideration of the sum of One And No/100 ($1.00) Dollars, and other good and valuable considerations, the receipt of which is hereby acknowledged, and the benefits accruing to Logan County, Arkansas, because of the construction, maintenance and operation of said dam and reservoir, does by these presents GRANT, BARGAIN, SELL, CONVEY AND CONFIRM unto the said party of the second part and its assigns the full, complete, perpetual, and permanent right, power, and privilege to inundate, submerge, and overflow permanently, temporarily, or intermittently as may be necessary, in connection with the operation and maintenance of the Blue Mountain Dam and Reservoir on Petit Jean River, the roads, bridges, approaches, and fills belonging to the said Logan County, Arkansas, and located, or to be located, within the boundary of said dam and reservoir area.

"Jurisdiction and control over the parts and portions of the county roads hereby affected are specifically reserved to the County."

The contract and flowage easement were approved by the County Court of Logan County, Arkansas, Southern District, on the same date, April 21, 1948.

12.

During the negotiations concerning the contract between the County and the United States, the only specific requirements with regard to road work made by the Government were the requirements set out in the contract with regard to the roads listed as Items A, B, C, and D. No agent of the Government has re-

quested the County Judge of Logan County, Arkansas, to do any work on the Bethel Church Road.

## Discussion

The first question to be determined is whether a person has a claim under the Tucker Act for the permanent intermittent flooding by the Government of a public road furnishing him the only means of ingress and egress to and from his property. Plaintiffs contend that they have such a cause of action, while the defendant contends they do not.

If plaintiffs' access road had been completely and permanently inundated, unquestionably this would amount to a taking of his property for which he would be entitled to compensation. Schiefelbein v. United States, 8 Cir., 124 F.2d 945; Union Electric Light & Power Co. v. Snyder Estate Co., 8 Cir., 65 F.2d 297. See also, United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787.

It is also firmly established that a permanent intermittent overflow of land is a partial taking for which the taker is bound to make just compensation to the owner. United States v. Sponenbarger, 308 U.S. 256, 267, 60 S.Ct. 225, 84 L.Ed. 230; Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 78 L.Ed. 142; United States v. Dickinson, 4 Cir., 152 F.2d 865, affirmed 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789; United States v. Willis, 4 Cir., 141 F.2d 314.

■■ Since the permanent inundation of a person's only access road amounts to a taking, and since a permanent intermittent overflow of land is a partial taking, it would seem to follow quite logically that a permanent intermittent overflow of a person's only access road would be a partial taking, requiring the payment of compensation by the taker. In the instant cases the evidence established without dispute that plaintiffs' only access road was completely cut off for a period of almost a month and that such overflows will recur in the future at the rate of approximately one in each ten years. The Court is convinced that plaintiffs have established a claim against the defendant under the Tucker Act and are entitled to recover unless one or more of the defendant's affirmative defenses is meritorious.

The defendant's first defense, relating to the claims of all the plaintiffs, is the six-year statute of limitations. 28 U.S.C.A. § 2401. It is the Government's contention that the taking, if in fact one occurred, was complete when the dam was constructed and placed in operation in 1947, or at least when the flowage easement was executed by the County in 1948. The Court is of the opinion that this defense is without merit.

In United States v. Dickinson, 331 U.S. 745, 748, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789, the court said:

"Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time. * * *

" * * * All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.' "

■ In the case at bar the first time ingress and egress was completely cut off was in the spring of 1957 by the flooding of the county road, and it was not until that time that the plaintiffs knew or had reason to know that their access ever would be completely cut off by the waters of the lake. Under such circumstances and under the rule in the Dickinson case, supra, the statute of limitations did not and has not run against the plaintiffs' claims.

With regard to the claims of the Tomlinsons and the Shigleys, the defendant makes the further contention that they were not the owners of the property at the time of the "taking", if in fact a taking occurred. Here again the Court is

convinced that under the authority of United States v. Dickinson, supra, the taking did not occur until May 1957, and plaintiffs were the owners of the property at that time. Thus, this alleged defense of the Government cannot be sustained.

The defendant makes the additional contention that the claim of the plaintiffs, Byron and Thelma Cravens, is barred by the res judicata doctrine.

As stated in Finding of Fact No. 10, Byron Cravens had previously instituted an action in this Court seeking to recover damages for the impairment of his access roads. At that time his access was not completely cut off although it was impaired to a great extent by the waters of the lake. The Court held that the Government was not liable for the inconvenience caused Cravens as a result of the inundation of the shortest and best route from Cravens' property to surrounding towns, since he still had an access road to and from the property. In the instant case Cravens contended and proved that his access was completely cut off by the waters of the lake.

■ The Court is convinced that Cravens is not barred by the res judicata doctrine. His first suit was an action to recover for the impairment of his access while the instant suit is to recover for the complete destruction of his access for a substantial period of time. These cases are somewhat similar to the series of cases involving the Portsmouth Harbor Land and Hotel Co. Peabody v. United States, 231 U.S. 530, 34 S.Ct. 159, 58 L.Ed. 351; Portsmouth Harbor Land & Hotel Co. v. United States, 250 U.S. 1, 39 S.Ct. 399, 63 L.Ed. 809; Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287. These cases involved separate and successive actions against the United States based upon the installation by the Government of large guns near the hotel property and the firing of projectiles across the hotel land. In the first two cases the court held that there was no taking, but in the third case the court found a taking because of the cumulative effect of the firing. At page 330 of 260 U.S., at page 137 of 43 S.Ct., the court said:

"The fact that the evidence was not sufficient in 1905 does not show that it may not be sufficient in 1922."

Compare, Chiotte v. Chiotte, 225 Ark. 101, 279 S.W.2d 296 (first suit not res judicata on the question of whether a person was a bona fide resident of the State); Thomas v. American Radio & Television, Inc., Ark., 312 S.W.2d 183 (suit on a promise to pay when able, dismissed without prejudice to the right of the promisee to bring another action should the promisor's future financial condition so warrant).

The defendant relies upon the case of North Counties Hydro-Electric Co. v. United States, Ct.Cl., 151 F.Supp. 322, certiorari denied 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112. In the North Counties case plaintiff attempted in its first suit to prove that its powerhouse had been flooded as a result of ice jams caused by the Government's dam and that such ice jams would recur in the future. Judgment went against the plaintiff in the first suit. Approximately ten years later plaintiff brought a new suit on the same cause of action, the only difference being that an additional flooding had occurred. The Court of Claims held that the second suit was barred by res judicata.

The difference in the North Counties case and the instant one is that in the North Counties case both suits were on the same cause of action, whereas the present suit involves a situation where the first action was for the impairment of access and the second action was for a complete destruction of all access for a substantial period of time, thus amounting to a partial taking of the property. It also seems that the decision in the North Counties case is based primarily upon the failure of plaintiff to prove that the floodings would inevitably recur. In the instant case the Government, through its own witnesses, established that the floodings would recur on the average of once every ten years.

Moreover, if the North Counties case were not distinguishable from the instant suit, the Court would not be inclined to follow the North Counties decision in view of the Supreme Court decisions in the Portsmouth Harbor Land & Hotel Co. cases, supra.

For the above reasons the Court is convinced that the res judicata doctrine does not bar the instant suit by the plaintiff, Byron Cravens.

The remaining question with regard to plaintiffs' claims against the defendant is the amount of damages to which they are entitled. In Schiefelbein v. United States, supra, the court at page 947 of 124 F.2d said:

"The property taken and for which compensation is payable is not the land to which access is cut off but the private property of the condemnee in the public highway. * * * It was made clear in United States v. Welch that the property for which compensation is payable is that actually taken, i. e., the right-of-way, and not that served by the right-of-way, although, said the Supreme Court, 'the value of the easement cannot be ascertained without reference to the dominant estate to which it was attached.'"

This seems to be merely another way of saying that the measure of compensation to which plaintiffs are entitled is the difference between the fair market value of their lands just before and just after the imposition of the easement. Slattery Co. v. United States, 5 Cir., 231 F.2d 37, 46; Karlson v. United States, 8 Cir., 82 F.2d 330, 337.

■ As is usual in such cases, there was a wide variance in the instant suit in the testimony of the Government and the testimony of the plaintiffs with regard to the damages sustained by plaintiffs as a result of the flooding and potential flooding in the future. A consideration of all the evidence convinces the Court that the damages sustained by the plaintiffs, Byron and Thelma Cravens, is $2,500; the damages sustained by the plaintiffs, Owen A. and Louise Tomlinson, is $1,600; and the damages sustained by Leon and Syble Shigley, is $600. ·

### Third-Party Complaint of United States against Logan County, Arkansas

The United States contends that in the event plaintiffs obtain judgment against it in this action, it is entitled to judgment over against Logan County under the indemnity provision of the contract set out in Finding of Fact No. 11. Defensively, Logan County contends that the contract between it and the United States was invalid and further that the contract does not purport to indemnify the United States in cases of this type.

To be more specific, Logan County relies primarily upon Article 12, Section 4, of the Arkansas Constitution, as amended by Amendment No. 10, and upon Sec. 17–416, Ark.Stats., 1947, Annotated. Section 4 of the Arkansas Constitution, supra, among other things provides:

"The fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and no county court or levying board or agent of any county shall make or authorize any contract or make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made * * *."

Sec. 17–416, Ark.Stats., supra, provides:

"No county court or agent of any county shall hereafter make any contract on behalf of the county unless an appropriation has been previously made therefor and is wholly or in part unexpended; and in no event shall any county court or agent of any county make any contract in excess of any such appropriation made, and the amount of such contract or contracts shall be limited to the amount of the appropriation made by the quorum court. [Acts 1917,

No. 217, § 3, p. 1184; C. & M. Dig., § 1976; Pope's Dig., § 2505.]"

The record is silent in the instant case as to whether an appropriation was made for the purpose of carrying out the indemnity agreement (although it reasonably may be assumed that none was, in fact, made) and as to whether the contract between the County and the United States would cause the County to expend money in excess of the revenue in the year in which the contract was made.

Assuming, however, that the contract was void as being contrary to the Constitution or to the statute above mentioned, it makes absolutely no difference in the outcome of the instant case. The County cannot accept all benefits of a contract as it has done in this case, and then defend on the ground that the contract was void. The rule is stated in Yaffe Iron & Metal Co. v. Pulaski County, 188 Ark. 808, 67 S.W.2d 1017, 1018, as follows:

"It is immaterial that the contract was void. Appellee cannot accept and hold appellant's money, also retain the bridges, and at the same time plead the invalidity of the contract in bar of recovery. This contention has been definitely and certainly determined by this court in a number of cases. International Harvester Co. of America v. Searcy County, 136 Ark. 209, 206 S.W. 312; Howard County v. Lambright, 72 Ark. 330, 80 S.W. 148; Forrest City v. Orgill Bros. & Co., 87 Ark. 389, 112 S.W. 891; City of Ft. Smith v. United States Rubber Co., 184 Ark. 588, 42 S.W.2d 1004.

"Appellee's second contention is that no appropriation was made by the quorum court of Pulaski county for the purpose of this claim. On this contention it suffices to say that it is fully answered by the cases heretofore referred to and cited. As a matter of common honesty, a county should not be permitted to accept and hold money as the purchase price for material purchased, and at the same time retain ownership and control of the materials so purchased, and assert, in bar of any recovery, that no previous appropriation had been made therefor."

To like effect see, Morr v. United States, 6 Cir., 243 F.2d 913; City of Hampton, Va., v. United States, 4 Cir., 218 F.2d 401; Lykes v. City of Texarkana, 223 Ark. 287, 265 S.W.2d 539; City of Ft. Smith v. United States Rubber Co., 184 Ark. 588, 42 S.W.2d 1004; International Harvester Co. of America v. Searcy County, 136 Ark. 209, 206 S.W. 312.

In a case similar to the instant case, the County had agreed "to pay to the Forest Service, on demand, any and all expenses incurred by the United States in suppressing fire caused by the permittee or its agent that is responsible for the construction of this road". United States v. San Diego County, D.C.Cal., 75 F.Supp. 619. In an action by the United States against the County, the court beginning at page 619 of 75 F.Supp. said:

"As one of the main governmental functions of the county relates to the maintenance of public roads (California Streets and Highways Code, Sec. 940), it has the power to enter into contracts to exercise such power. California Political Code, Sec. 4003(3). While it is true that in dealing with public corporations, the 'mode is the measure of the power,' it would be neither good law nor good ethics to hold that the county can seek from the sovereign government of the United States a benefit —a right of way through the public domain—which it could not obtain in other manner, agree to reimburse the Government for fires caused by itself or those charged with road construction, and then plead lack of power in order to avoid the consequence of such contract solemnly entered into for its own benefit by its chief legislative body."

In the present case, even if the contract between the County and the United States were void, the United

States has fully performed its obligations under said contract, including the payment to the County of $72,400, and the County is in no position to defend on the ground of the alleged invalidity of the contract.

■ The final question is whether the indemnity provision in the contract covers the type of situation involved in this action. Logan County agreed to hold and save the Government harmless "from liability of any nature or kind, for or on account of any claim for damages which may be filed or asserted by third persons, as a result of the work to be performed by the Contractor hereunder, or *on account of the permanent or temporary inundation of the roads,* bridges, approaches, and fills, and for damages of every kind and nature, direct and indirect, to said roads, bridges, approaches, and fills, as a result of the operation of the reservoir." In the opinion of the Court this provision clearly and categorically obligates the County to indemnify the United States against the very type of liability involved here, i. e., liability for the temporary inundation of the roads.

It follows that the United States is entitled to a judgment over against Logan County in the amount of $4,700, the total sum of the judgments obtained by plaintiffs against the United States.

Conclusions of Law

1.

The Court has jurisdiction of the parties and the subject matter herein.

2.

The plaintiffs, Byron Cravens and Thelma Cravens, are entitled to recover of and from the defendant, United States of America, the sum of $2,500.

3.

The plaintiffs, Owen A. Tomlinson and Louise Tomlinson, are entitled to recover of and from the defendant, United States of America, the sum of $1,600.

4.

The plaintiffs, Leon Shigley and Syble Shigley, are entitled to recover of and from the defendant, United States of America, the sum if $600.

5.

■ The defendant, United States of America, is entitled to a judgment over against the third-party defendant, Logan County, Arkansas, in the sum of $4,700. Of course, the United States will not be entitled to enforce its judgment against Logan County unless and until the United States has paid the judgment in favor of the plaintiffs in this action.

A judgment in accordance with the above should be entered.