**G.E. AMICK, et al.,**

v.

**The UNITED STATES.**

**Cong.Ref. No. 5–76.**

United States Claims Court.

June 6, 1984.

Addendum July 26, 1984.

Joseph B. Phillips, Stockton, Mo., for claimant nos. 1 and 3–24 and Samuel J. Short, Jr., Stockton, Mo., for claimant no. 2, plaintiffs.

Lynn Rubinstein, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## REPORT OF THE HEARING OFFICER

SETO, Hearing Officer:

On July 22, 1976, Senator Thomas F. Eagleton submitted to the United States Senate S. 3690, entitled "A Bill For the Relief of R. Dean Dawes and others." The bill provided: [1]

> That (a) the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to each of the individuals named in subsection (b) the amount set forth opposite the name of each such individual in full settlement of all claims of each such individual against the United States for damages arising in connection with the flooding of certain lands as a result of the unnecessary release of excess amounts of water from the Stockton [Missouri] Dam and Reservoir during the period from November 1972 through June 1974, at which time such dam and reservoir was [sic] in operation under the control of the United States Army Corp [sic] of Engineers.

Subsection (b) of the bill listed most of the plaintiffs of record herein and authorized payments ranging from $665 to $95,000, with a total sum authorized of $406,252.86. The bill was read twice and referred to the Committee on the Judiciary.

On August 6, 1976, Senator James Eastland presented the Committee's report, S.Rep. No. 94–1132, recommending that the bill be referred to the Chief Commissioner of the United States Court of Claims.[2] On August 9, 1976, the Senate passed a resolution, S.Res. 491, referring the bill to the Court of Claims.[3] The pertinent papers were duly filed with the Clerk of the Court of Claims on August 18, 1976. Plaintiffs filed a petition on November 15, 1976, and the case was referred by Chief Commissioner Roald A. Hogenson to Trial Commissioner C. Murray Bernhardt by an Order of Reference filed November 18, 1976. On January 5, 1982, the Order of Reference was vacated, and the case was referred to the undersigned for the conduct of proceedings. Following the passage of the Federal Courts Improvement Act of 1982, Pub.L. 97–164, 96 Stat. 25, and pursuant to 28 U.S.C. § 2509(a), as amended by § 139(h)(1) of that Act, Chief Judge Alex Kozinski ordered that the undersigned continue as the Hearing Officer for this case; that Judge Phillip R. Miller continue as Presiding Judge of the Review Panel; and that Judges Christine C. Nettesheim and Lawrence S. Margolis be designated as members of the Review Panel.

On October 31, 1983, the parties submitted, through counsel for defendant, "Proposed Findings of Fact and Recommendation Regarding Entry of Opinion." The Hearing Officer requested, and counsel for defendant filed on February 13, 1984, a "Memorandum in Support of Proposed Findings of Fact." These two submissions were accompanied by letters of concurrence from counsel for plaintiffs.

---

1. A copy of the full text of the bill is appended to this report.

2. The Claims Court has acceded to the jurisdiction and pending cases of the Court of Claims. *See* Federal Courts Improvement Act of 1982,

Pub.L. 97–164, 96 Stat. 25 and General Order No. 1, 1 Cl.Ct. XXI (1982).

3. Copies of S.Rep. No. 94–1132 and S.Res. 491 are appended to this report.

The submissions and the original petition form the basis of this report.[4]

## FACTS

Between November 1972 and June 1974, plaintiffs herein were all owners or operators of, or sharecroppers on, agricultural land along the Sac River downstream of Stockton Lake, Missouri. The lake is the result of the Stockton Dam at river mile 51.6 of the Sac River; the building of the dam was authorized by the Flood Control Act of 1954, Pub.L. No. 83–780, 68 Stat. 1256. The dam was built to provide flood control and hydroelectric power for the surrounding area.

Before constructing the dam, the U.S. Army Corps of Engineers (the "Corps") made estimates of the amounts of water that could properly be channeled through parts of the Sac River downstream of the dam. The Corps estimated the downstream capacity of the river to be 12,000 cubic feet of water per second (cfs). Using that estimate, a 52,000 kilowatt hydroelectric generator was installed at the dam. At overload capacity, such a unit would discharge water at rates up to 11,000 cfs. The unit began initial operations in November 1972, but initial test discharges were terminated after complaints of downstream flooding. Further investigation revealed that the Corps' original estimate was in error by a factor of more than 2; in fact, downstream flooding occurred in certain areas of the river when the water flow was between 5,000 and 5,300 cfs. The Corps has since publicly and officially acknowledged the error in its original estimates.

The plaintiffs filed claims for various items of damage (including lost crops, equipment, and livestock; lost opportunities to plant and harvest crops; and personal damages) with the Corps, but were denied recovery on the ground that the Government is immune from suits for such damages. Several plaintiffs filed suit in the United States District Court for the Western District of Missouri, Southern Division, but were denied recovery on the ground of sovereign immunity. *Pyle, et al. v. United States*, No. 73–CV–90–5 (1973). The introduction of Senator Eagleton's bill, S. 3690, followed.

## DISCUSSION

Jurisdiction of this case is vested in this court by 28 U.S.C. § 1492:

Any bill, except a bill for a pension, may be referred by either House of Congress to the chief judge of the United States Claims Court for a report in conformity with section 2509 of this title. [As amended Apr. 2, 1982, by the Federal Courts Improvement Act of 1982, Pub.L. 97–164, Title I, § 133(c)(1), 96 Stat. 40.]

As noted above, the referenced bill is S. 3690, which received a favorable committee report, S.Rep. No. 94–1132, and was referred to this court by S.Res. 491. The resolution directs this court to:

proceed with [S. 3690] in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report thereon to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity in the amount, if any, legally or equitably due from the United States to the claimant.

Specific instructions regarding what is required of the court in a Congressional Reference case are set forth in 28 U.S.C. § 2509(c), (d):

(c) The hearing officer to whom a congressional reference case is assigned by the chief judge shall proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts

---

4. Copies of the proposed findings and the memorandum, along with the accompanying concur-

rences, are appended to this report.

claimed to excuse the claimant for not having resorted to any established legal remedy. He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant. (d) The findings and conclusions of the hearing officer shall be submitted by him, together with the record in the case, to the review panel for review by it pursuant to such rules as may be provided for the purpose, which shall include provision for submitting the report of the hearing officer to the parties for consideration, exception, and argument before the panel. The panel, by majority vote, shall adopt or modify the findings or the conclusions of the trial commissioner. [As amended Apr. 2, 1982, by the Federal Courts Improvement Act of 1982, Pub.L. 97–164, Title I, § 139(h), 96 Stat. 42.]

As noted above, the findings of fact required by the statute are gleaned from the parties' settlement memoranda. No trial has been held in this case and, in view of the settlement stipulation, none is deemed necessary.[5] Therefore, there being no dispute as to the existence of the operative underlying facts, the court accepts them as set forth in the attached Findings. What is left to be determined is whether, in light of these facts, the stipulated settlement comports with the principles applicable to Congressional Reference cases.

■ Under the circumstances of this case, there is no need to present particular findings "relating to delay, or laches, ... [or] the bar of any statute of limitation"[6], except to state that these considerations should have no bearing on the disposition of this case. Plaintiffs are not guilty of any delay in pursuing their claims: the period from the very first occurrence of the flooding giving rise to this action to the reference by the Senate of this case to the court was only four years. Since there was no unreasonable delay by plaintiffs, the doctrine of laches is inapplicable. *See, e.g., Foster v. United States,* 3 Cl.Ct. 440, 442 (1983) [NETTESHEIM, J.] (inexcusable delay is a requisite element of laches) and cases cited therein. Likewise, there is no bar imposed by any statute of limitation inasmuch as this claim was made well within the six-year period imposed by the statute generally applicable to claims of which this court has jurisdiction. 28 U.S.C. § 2501.

■ In the memorandum regarding the stipulated settlement, the parties agree that plaintiffs do not have a legal remedy against the United States for any damages plaintiffs may have suffered. Where land has been flooded by an action of the Government, the proper legal remedy for one whose land has been so taken is an action under the Fifth Amendment to the Constitution. In order to prevail in a suit for a taking, however, plaintiffs would have to show that more than just one incidence of flooding occurred:

It is clear under the authorities that the flooding of an owner's land on but one occasion does not constitute a taking. Before there can be a taking a servitude must have been imposed upon the land, that is to say, a subjection of the land for a more or less definite time to a use inconsistent with the rights of the owner. [*North Counties Hydroelectric Co. v. United States,* 70 F.Supp. 900, 108 Ct.Cl. 470, 485 (1947), *cert. denied,* 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957) (citing cases).]

In *B Amusement Co., et al. v. United States,* 180 F.Supp. 386, 148 Ct.Cl. 337 (1960), the Court of Claims restated the rule regarding a taking by flooding as: "One flooding does not constitute a taking and plaintiffs have failed to show by their evidence the flooding which occurred ...

---

5. Trial in this case been twice scheduled and twice cancelled while the parties pursued settlement negotiations and discovery. In fact, the vast majority of the record in this case consists of motions for enlargements of time and deferrals of due dates while the parties conducted discovery and explored settlement possibilities.

6. 28 U.S.C. § 2509(c).

will inevitably recur.... This fact is essential to prove a taking." *Id.*, 180 F.Supp. 386, 148 Ct.Cl. at 341–342, citing *North Counties Hydroelectric Co., supra.* See also *Bartz, et al. v. United States*, 224 Ct.Cl. 583, 593 (1980) (in inverse condemnation suit, plaintiffs failed to show a taking "because they failed to prove the element of inevitably recurring floods") and cases cited therein. In the case at bar, the parties have stipulated that the flooding caused by the Corps' test discharge releases will not "inevitably recur." Plaintiffs are therefore unable to state a legal claim for a taking and, under this theory, are also barred from recovery for other damages. *B Amusement Co., supra*, 180 F.Supp. 386, 148 Ct.Cl. at 341 ("It is well settled that consequential damages form no basis for such a recovery."); *Bartz, supra*, at 593 ("Indirect or consequential damages are not compensable.")

The question whether plaintiffs can recover under any legal tort theory is fully answered, in the negative, by the opinion in *B Amusement Co., supra*, 180 F.Supp. 386, 148 Ct.Cl. at 342:

> Nor have plaintiffs a legal claim under a tort theory of recovery. In providing for a broad plan of flood control on the Mississippi River and its tributaries, of which the Missouri River is one [as is the Sac River], Congress specifically provided that "No liability of any kind shall attach to or rest upon the United States from any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. This long established policy of non-liability is bottomed on public policy and not sovereign immunity, but, at any rate, it is a withdrawal of consent to be sued in such cases, if it can be said that such consent had previously been given. We agree ... that this section was not intended to be repealed by the enactment of the Federal Tort Claims Act. [Citations omitted.]

The parties have not shown, nor can the court find, any case or enactment subsequent to the decision in *B Amusement Co.* which would vitiate the effect of the quoted language. It is our conclusion that no legal remedy exists for the plaintiffs herein.

■ There being no possibility of plaintiffs' recovering under any legal theory, we turn now to consideration of whether plaintiffs have an equitable claim against the United States. It has been clear, at least since the decision of the Court of Claims in *Burkhardt, et al. v. United States*, 84 F.Supp. 553, 113 Ct.Cl. 658 (1949), that:

> the term "equitable claim" as used in 28 U.S.C., Sec. 2509, is not used in a strict technical sense meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon general equitable considerations. [*Id.* 84 F.Supp. 553, 113 Ct.Cl. at 667.]

The court based its definition on a discussion by the Supreme Court of Congress' power under Article I, § 8, of the Constitution "to pay the debts" of the United States:

> The term "debts" includes those debts or claims which rest upon a merely equitable or honorary obligation and which would not be recoverable in a court of law if existing against an individual. The nation, broadly speaking, owes a "debt" to an individual when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded. * * * Payments to individuals, not of right or of a merely legal claim, but payments in the nature of a gratuity, yet having some feature of moral obligation to support them, have been made by the government by virtue of acts of Congress, appropriating the public money, ever since its foundation. [*United States v. Realty Company*, 163

U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215 (1896).]

*See also Froman, et al. v. United States,* 157 Ct.Cl. 661, 669 (1962); *Phillips v. United States,* 207 Ct.Cl. 924, 929 (1975). To state a valid "equitable claim," plaintiffs need not even establish a fault on the part of the Government. *Town of Kure Beach v. United States,* 168 Ct.Cl. 597, 622–623 (1964); *Ghitescu v. United States,* 201 Ct.Cl. 823, 838 (1973). *See especially Rumley v. United States,* 169 Ct.Cl. 100 (1965), where the court held that a claimant in a congressional reference case stated a valid and compensable "equitable claim" against the Government even though he was guilty of breaching a contract with the United States and was basing his claim on the Government's response to that breach.

■ Under *Burkhardt* and *Rumley,* therefore, the court in this case need not determine whether the Corps was "at fault" for conducting discharge tests based on erroneous estimates of downstream channel capacities; rather, the court must only determine whether plaintiffs have suffered losses because of the tests. The parties have stipulated that losses occurred, and the court so finds. The Government has stipulated that the Corps allowed discharge releases of water in excess of channel capacity on the following dates: November 3–12 and November 22–24, 1972; March 23, April 19, April 20, April 28–30, May 1–30, and June 1–29, 1973. The memorandum states that there was no flood damage discovered in 1974. Plaintiffs assert, and defendant does not dispute,[7] that plaintiffs suffered losses as a result of the flooding caused by the discharges. The parties, having conducted settlement negotiations since the filing of defendant's answer, have concluded that plaintiffs should be compensated for such losses. As a result of these negotiations, plaintiffs have reduced their claims for losses to an aggregate amount of $100,-753.00, which is twenty-nine and a half per cent of their original aggregate claim of $341,502.86. The court will give due deference to the long-negotiated agreement of able and informed counsel, and finds that the aggregate amount of $100,753.00 is fair and adequate recompense for plaintiffs' losses.

## CONCLUSION

On the basis of the foregoing, our conclusions are that: plaintiffs herein have no legal or technically equitable claim against the United States; plaintiffs have suffered a loss for which the United States should, in fairness and good conscience, make recompense in the amount of $100,753.00, divided among plaintiffs as shown in the following table; and that such compensation would not be a mere gratuity. It is therefore recommended that the referred bill, S. 3690, 94th Cong., 2d Sess. (July 22, 1976), be approved, and that payment to each plaintiff be authorized and directed as follows:[8]

| Plaintiff | Amount |
| --- | --- |
| R. Dean Dawes | $ 2,700.00 |
| Harlen Chism | 6,596.00 |
| Ray and Clara Pinkman | 4,211.00 |
| Perrin Masters | 2,394.00 |
| Ray M. Pinkman | 3,819.00 |
| A. W. Spillers | 3,500.00 |
| Hester E. Simrell | 2,200.00 |
| G. E. Amick | 3,200.00 |
| T. M. Montgomery | 3,087.00 |
| T. M. and Berle Montgomery | 190.00 |
| A. C. and Virginia I. Montgomery | 4,500.00 |
| Irene Larson and Virginia Montgomery | 7,796.00 |

7. Although the Government admits that the actions and/or errors of the Corps were connected with plaintiffs' losses, it explicitly does *not* admit that the Government is therefore liable for these losses in a legal or technically equitable sense.

8. Although stated in the bill (S. 3690), the following claims were not presented as such in plaintiffs' petition: T.L. Montgomery of Las Animas, Colorado, for $27,000; G.Y. Leffler of Stockton, Missouri, for $37,640; and G.Y. and Ruby Dean Leffler, for $10,354. Ruby Dean Leffler joined the petition for herself and on behalf of her deceased husband, and with that exception, no findings have been made regarding the claims of these parties, and it is recommended that their names be stricken from the bill and that they be denied any recovery.

| Plaintiff | Amount |
| --- | --- |
| Ruby Dean Leffler | $ 4,982.00 |
| Edward C. and Frances Pyle | 1,545.00 |
| Gilbert and Pansey Pyle and Ronnie and Kay Pyle | 4,422.00 |
| Gilbert and Ronnie Pyle | 11,458.00 |
| Lageta Cowan | 3,200.00 |
| Swangel Estate | 12,123.00 |
| W. H. Eslinger | 5,668.00 |
| J. C. Eslinger | 5,668.00 |
| Max Smith | 310.00 |
| Lat and Zella Lee Smith | 384.00 |
| Riley Carver | 6,800.00 |

## FINDINGS OF FACT

The hearing officer, pursuant to paragraph 8, Appendix D, "Procedure in Congressional Reference Cases," Rules of the United States Claims Court, reports to the Review Panel the following findings of fact:

1. On July 22, 1976, S. 3690 was introduced in the 94th Congress, 2d Session, which bill was entitled: "A bill for the relief of R. Dean Dawes and others." Thereafter, on August 9, 1976, S.Res. 491, 94th Congress, 2d Session, passed the Senate, providing as follows:

Resolved, That the bill (S. 3690) entitled "A bill for the relief of R. Dean Dawes and others", [sic] now pending in the Senate, together with the accompanying papers, is referred to the Chief Commissioner of the United States Court of Claims; and the Chief Commissioner shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report thereon to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity in the amount, if any, legally or equitably due from the United States to the claimant.

2. S. 3690, 94th Congress, 2d Session, provided in part as follows:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to each of the individuals named in subsection (b) the amount set forth opposite the name of each such individual in full settlement of all claims of each such individual against the United States for damages arising in connection with the flooding of certain lands as the result of the unnecessary release of excess amounts of water from the Stockton Dam and Reservoir during the period from November 1972 through June 1974, at which time such dam and reservoir was [sic] in operation under the control of the United States Army Corp [sic] of Engineers.

3. The bill quoted above named 35 claimants asserting, jointly or separately, 27 claims in the aggregate amount of $406,252.86. Plaintiffs' petition embodies the majority of the claims recorded in the bills with the following changes:

a. T.L. Montgomery of Las Animas, Colorado, and G.Y. Leffler of Stockton, Missouri, did not join in the petition.

b. The claim of Lageta Cowan, deceased, was presented by Ione Collins, H. Wade Cowan, and Eldene Russell as her sole heirs and successors in interest, and individually; and

c. The claim of Loy Swangel, Blanche Goddard, Elizabeth McCarthy, and Helen Good was presented by Bertha Swangel as heir and successor in interest to Loy Swangel, and Blanche Goddard, Elizabeth McCarthy, Helen Good, and Hazel Swartz, individually and as heirs and successors in interest to Loy Swangel, deceased (hereinafter collectively referred to as "Swangel Estate");

The petition therefore contained 24 claims, presented by a total of 37 claimants, in the aggregate amount of $379,280.36. Plaintiffs' claims are taken up at finding 14.

4. By enacting the Flood Control Act of 1954, Pub.L. 83–780, 68 Stat. 1256, Congress authorized, *inter alia*, the construction of the Stockton Dam and Reservoir for the purposes of flood control and hydroelectric power generation. The dam is located at river mile 51.6 of the Sac River and was, at all times relevant hereto, operated under the control of the United States Army Corps of Engineers (the "Corps").

5. Prior to construction of the Stockton facility, the Corps made, or directed the making of, estimates of the channel capacities of certain parts of the Sac River downstream from the dam site. These estimates were made in an attempt to predict the volume of water, measured in cubic feet per second ("cfs"), that could be safely released from the reservoir in carrying out the purposes of the Stockton facility. The channel capacity was estimated by the Corps to be 12,000 cfs.

6. Based on its channel capacity estimates, the Corps constructed a 52,000 kilowatt hydroelectric power generating unit at the Stockton Dam. Maximum power generation from a generator of such size would result in discharges of water at rates of up to 11,000 cfs.

7. The downstream channel capacity of the relevant areas was in fact between 5,000 cfs and 5,300 cfs. Therefore, a discharge flow of greater than 5,300 cfs would cause flooding in those areas having a lesser channel capacity.

8. The Corps conducted tests and initial operations of the generator (based on its erroneous estimates of channel capacity) between November 3 and November 12, 1972, and between November 22 and November 24, 1972. The testing during each period was terminated upon receipt of complaints of flooding. The tests were terminated at the end of the second period.

9. In 1973, the Corps, aware then of the flooding problems, operated the Stockton generator at a restricted capacity. During this time, the flood pool reached only 72% of its full capacity. Expressed simplistically, the flood pool capacity is a measure of the volume of water that can be retained above the dam without causing flooding in those areas upstream of the dam. Because the maximum flood pool elevation was never reached during 1973, it is inferred, in the absence of evidence to the contrary, that none of the 1973 releases were occasioned by the need for emergency flood control measures.

10. Despite the availability of over one-quarter of the flood pool elevation, several discharges in excess of 5,300 cfs were made during the year. These discharges were made to assess the impact of the newly discovered channel capacity restraints on operations and to assess the extent of downstream flooding in certain power generation configurations. Discharges in excess of downstream channel capacities were made on March 23, April 19, April 20, April 28 through April 30, May 1 through May 30, and June 1 through June 29, 1973. Specifically, discharges made between April 28 and June 29 ranged from 6,100 cfs to 7,400 cfs.

11. No discharges in excess of channel capacity were made during 1974.

## DISPOSITION

12. It is found that the discharges of water from the Stockton generator in excess of channel capacity, at the times specified in Findings 8 and 10, occasioned losses due to flooding to plaintiffs herein.

13. Settlement negotiations between plaintiffs and defendant were begun soon after the filing of defendant's answer to the petition, and were continuously pursued until the latter part of 1983. On October 31, 1983, the parties, through counsel for defendant, submitted a stipulated recommendation regarding a settlement. By Order of the hearing officer, defendant's counsel filed a memorandum in support of the stipulation, and plaintiffs' attorneys filed letters concurring in the stipulated recommendation and memorandum.

Plaintiffs' claims will be considered in the order and by the numbers of which they are designated in the petition. Plaintiffs' losses have not been itemized here

because the amounts recommended as compensation are intended to be full and complete satisfaction of the claims. The "relevant time period" referred to in Findings 14 through 36 is the time period set forth in the bill (S. 3690), *viz.*, from November 1972 to June 1974 and, more specifically, refers to the dates set forth in Findings 8 and 10, *supra.*

14. (1) G.E. Amick, Route 2, El Dorado Springs, Missouri, was a rental-sharecropper on lands which were flooded during the relevant time period. It is found that the sum of $3,200.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

15. (2) Riley and Iva M. Carver, RFD 2, El Dorado Springs, Missouri, are owners of lands which were flooded during the relevant time period. It is found that the sum of $6,800.00, as compensation for their losses, is a fair and reasonable settlement of their claim.

16. (3) Harlen Chism, Route 3, Stockton, Missouri, was a sharecropper on lands which were flooded during the relevant time period. It is found that the sum of $6,596.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

17. (4) Lageta Cowan, whose claim now accrues to her heirs and successors in interest, was an owner of lands which were flooded during the relevant time period. It is found that the sum of $3,200.00, as compensation for her losses, is a fair and reasonable settlement of the claim.

18. (5) R. Dean Dawes, Route 1, Stockton, Missouri, is the owner of lands which were flooded during the relevant time period. It is found that the sum of $2,700.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

19. (6) J.C. Eslinger, Stockton, Missouri, was the operator on lands which were flooded during the relevant time period. It is found that the sum of $5,668.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

20. (7) W.H. Eslinger, of Stockton, Missouri, was the owner of lands which were flooded during the relevant time period. It is found that the sum of $5,668.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

21. (8) Irene Larson, Aurora, Missouri, and Virginia I. Montgomery, Stockton, Missouri, were owners of property which was flooded during the relevant time period. It is found that the sum of $7,796.00, as compensation for their losses, is a fair and reasonable settlement of their claim.

22. (9) Ruby Dean Leffler, Route 3, Stockton, Missouri, is the owner, as the surviving tenant by the entirety of a tenancy with her husband, Y.G. Leffler, deceased, of lands which were flooded during the relevant time period. It is found that the sum of $4,982.00, as compensation for her losses, is a fair and reasonable settlement of her claim.

23. (10) Perrin Masters, Route 2, Stockton, Missouri, is the owner of property which was flooded during the relevant time period. It is found that the sum of $2,394.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

24. (11) Virginia I. Montgomery, Stockton, Missouri, was the owner, as the surviving tenant by the entirety of a tenancy with her husband, A.C. Montgomery, deceased, of property which was flooded during the relevant time period. It is found that the sum of $4,500.00, as compensation for losses, is a fair and reasonable settlement of her claim.

25. (12) T.M. Montgomery, Route 1, Stockton, Missouri, was the operator on lands which were flooded during the relevant time period. It is found that the sum of $3,087.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

26. (13) T.M. and Berla Montgomery, Route 1, Stockton, Missouri, were owners of land which was flooded during the relevant time period. It is found that the sum of $190.00, as compensation for their loss-

es, is a fair and reasonable settlement of their claim.

27. (14) Ray M. Pinkman, Route 1, Stockton, Missouri, was a tenant sharecropper of land which was flooded during the relevant time period. It is found that the sum of $3,819.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

28. (15) Ray and Clara Pinkman, Route 1, Stockton, Missouri, were owners of land which was flooded during the relevant time period. It is found that the sum of $4,211.00, as compensation for their losses, is a fair and reasonable settlement of their claim.

29. (16) Edward C. and Frances Pyle, Route 3, Stockton, Missouri, were owners of land which was flooded during the relevant time period. It is found that the sum of $1,545.00, as compensation for their losses, is a fair and reasonable settlement of their claim.

30. (17, 19) Gilbert and Pansy Pyle and Ronnie and Kay Pyle, Stockton, Missouri, were owners of lands which were flooded during the relevant time period. It is found that the sum of $4,422.00, as compensation for their losses, is a fair and reasonable settlement of their claims.

31. (18) Gilbert Pyle and Ronnie Pyle, Stockton, Missouri, were tenant sharecroppers on land which was flooded during the relevant time period. It is found that the sum of $11,458.00, as compensation for their losses, is a fair and reasonable settlement of their claim.

32. (20) Hester E. Simrell, Stockton, Missouri, was the owner of lands which were flooded during the relevant time period. It is found that the sum of $2,200.00, as compensation for her losses, is a fair and reasonable settlement of her claim.

33. (21) Lat and Zella Lee Smith, Stockton, Missouri, were owners of land which was flooded during the relevant time period. It is found that the sum of $384.00, as compensation for their losses, is a fair and reasonable settlement of their claim.

34. (22) Max Smith, Stockton, Missouri, was the owner of land which was flooded during the relevant time period. It is found that the sum of $310.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

35. (23) A.W. Spillers, Route 2, El Dorado Springs, Missouri, was a tenant sharecropper of lands which were flooded during the relevant time period. It is found that the sum of $3,500.00, as compensation for his losses, is a fair and reasonable settlement of his claim.

36. (24) Loy Swangel, now represented by claimant Swangel Estate, was the owner of lands which were flooded during the relevant time period. It is found that the sum of $12,123.00, as compensation for his losses, is a fair and reasonable settlement of the claim.

## CONCLUSIONS

1. Although actions attributable to the United States resulted in losses to the claimants herein, those actions did not constitute a taking of property compensable by an action under the Fifth Amendment to the Constitution. Furthermore, the Government is shielded by statute from a suit sounding in tort, assuming *arguendo* the actions referred to herein were tortious. Therefore, claimants have no legal claim against the Government.

2. An "equitable claim" under 28 U.S.C. § 2509 is not limited to a judicially cognizable claim in a court of equity, but rather encompasses claims which are morally enforceable, or which would be recognized in good conscience.

3. As a matter of fairness and good conscience, the United States should pay over, to each claimant herein, the amounts respectively specified in Findings 14 through 36 above.

## ADDENDUM TO REPORT OF THE HEARING OFFICER

The Report of the Hearing Officer ("Report") in this Congressional Reference case was filed on June 6, 1984. Since that date,

pursuant to paragraph 9 of Appendix D to the Rules of the United States Claims Court, all of the parties have filed acceptances of the Hearing Officer's findings and conclusions.

It has been discovered that paragraph 21 of the Amended Proposed Findings of Fact and Recommendation Regarding Entry of Opinion (which, along with claimants' counsels' concurrences, is appended to the Report) contains a recommended finding with respect to only Max A. Smith. That recommended finding is reflected in Finding of Fact 34 of the Report and in the brief listing on page 10 of the Report. Senate Bill S. 3690, referred to this court pursuant to Senate Resolution 491, and the petition filed in this case, list both Max A. and Betty Lee Smith as claimants.

It is the finding and conclusion of the Hearing Officer that the addition of Betty Lee Smith, as one who should be compensated jointly and severally with Max A. Smith, is just and proper and, furthermore, comports with the listings of the claimants found in S. 3690 and the petition filed in this case. Counsel for claimants and counsel for defendant have represented to the Hearing Officer that this change is proper.

THEREFORE:

1. It is the Hearing Officer's recommendation that the Report submitted to the Review Panel be amended in the following particulars:

 a. On page 10 of the Report, line 26 should be deleted and

 Max A. and Betty Lee Smith 310.00 should be substituted therefor; and

 b. On page 16 of the Report, paragraph 34 should be amended to read as follows:

 34. (22) Max A. and Betty Lee Smith, Stockton, Missouri, were the owners of land which was flooded during the relevant time period. It is found that the sum of $310.00, as compensation for their losses, is a fair and reasonable settlement of their claim.

2. This amendment is made in the interests of fairness and to afford the Review Panel a full and complete record of the findings and conclusions of the Hearing Officer.

3. This Addendum to the Report of the Hearing Officer should be appended to and made a part of the Report of the Hearing Officer filed on June 6, 1984.

## APPENDIX

note—Aug. 10, 1976—Report requested from the Secretary of the Army

Filed Aug. 18, 1976

94TH CONGRESS

2D SESSION

S. 3690

IN THE SENATE OF THE UNITED STATES

JULY 22, 1976

MR. EAGLETON introduced the following bill; which was read twice and referred to the Committee on the Judiciary

**A BILL**

For the relief of R. Dean Dawes and others.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to each of the individuals named in subsection (b) the amount set forth opposite the name of each such individual in full settlement of all claims of each such individual against the United States for damages arising in connection with the flooding of certain lands as the result of the unnecessary release of excess amounts of water from the Stockton Dam and Reservoir during the period from November 1972 through June 1974, at which time such dam and reservoir was in operation under the control of the United States Army Corp of Engineers.

(b) The individuals referred to in subsection (a) and the amounts of money due each such individual are as follows:

R. Dean Dawes of Stockton, Missouri, $7,000.

Harlen Chism of Stockton, Missouri, $13,051.50.

Ray and Clara Pinkman of Stockton, Missouri, $7,069.30.

Perrin Masters of Stockton, Missouri, $7,600.

Ray M. Pinkman of Stockton, Missouri, $7,300.

A.W. Spillers of El Dorado Springs, Missouri, $12,215.82.

Hester E. Simrell of Stockton, Missouri, $5,653.91.

G.E. Amick of El Dorado Springs, Missouri, $10,167.

T.M. Montgomery of Stockton, Missouri, $7,500.

T.L. Montgomery of Las Animas, Colorado, $27,000.

T.M. and Berla Montgomery of Stockton, Missouri, $1,000.

A.C. and Virginia Montgomery of Stockton, Missouri, $9,986.

Irene Larson of Aurora, Missouri and Virginia Montgomery of Stockton, Missouri, $18,891.

G.Y. Leffler of Stockton, Missouri, $37,640.

Ruby Dean Leffler of Stockton, Missouri, $37,640.

G.Y. and Ruby Dean Leffler of Stockton, Missouri, $10,354.

Edward C. and Frances Pyle of Stockton, Missouri, $14,132.50.

Gilbert and Ronnie Pyle of Stockton, Missouri, $21,215.

Ronnie and Kay Pyle of Stockton, Missouri, $3,789.25.

Gilbert and Pansy Pyle of Stockton, Missouri, $3,789.25.

Lageta Cowan of Stockton, Missouri, $10,167.

Loy Swangel, Blanche Goddard, Elizabeth McCarthy, and Helen Good of Stockton, Missouri, $18,808.33.

W.H. Eslinger of Stockton, Missouri, $8,698.

J.C. Eslinger of Stockton, Missouri, $8,698.

Max A. and Betty L. Smith of Stockton, Missouri, $665.

Lat and Zella Lee Smith of Stockton, Missouri, $1,222.

Riley and Iva M. Carver of El Dorado Springs, Missouri, $95,000.

SEC. 2. No part of each amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, any contract to the contrary notwithstanding. A violation of this section is a misdemeanor punishable by a fine in an amount not to exceed $10,000.

## Calendar No. 1067

| 94TH CONGRESS<br>2d Session | SENATE | REPORT<br>No. 94-1132 |
|---|---|---|

Filed Aug. 18, 1976

R. DEAN DAWES

August 6, 1976.—Ordered to be printed

MR. EASTLAND, from the Committee on the Judiciary, submitted the following

### REPORT

[To accompany S. Res. 491]

The Committee on the Judiciary, to which was referred the resolution, (S. Res. 491), to refer the bill S. 3690, entitled "A bill for the relief of R. Dean Dawes and others" to the Chief Commissioner of the U.S. Court of Claims for a report thereon, having considered the same, reports favorably thereon without amendment and recommends that the resolution be agreed to.

#### PURPOSE

The purpose of this resolution is to refer S. 3690, entitled "A bill for the relief of R. Dean Dawes and others", now pending in the Senate, together with all the accompanying papers, to the U.S. Court of Claims. The Chief Commissioner is directed to proceed in accordance with section 1492 and

2509 of title 28, United States Code, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity and the amount of any, legally or equitably due from the United States to the claimants.

STATEMENT

The resolution (S.Res.491), refers the bill S. 3640, to the Chief Commissioner of the U.S. Court of Claims, for a report concerning the liability, if any, of the United States for personal and property damage caused by the release of water from the Stockton Dam and Reservoir, Stockton, Missouri, during the winter of 1972 and the spring of 1973. The damages arose out of the flooding of agricultural land downstream, due to a design deficiency in the Stockton Missouri Dam and Lake Project. The project is run by the Army Corps of Engineers. Cumulatively, claimants seek compensation totaling more than $400,000, but are presently barred from pressing their claim in court by the doctrine of sovereign immunity. The only remedy open to the claimants is through private relief legislation such as is contained in S. 3690.

The bill, S. 3690, introduced in the Senate on July 22, 1976, by Senator Thomas F. Eagleton and referred to this Committee, provides for relief of each of the named claimants in the amount set forth opposite the name of each individual, as follows:

R. Dean Dawes of Stockton, Missouri, $7,000.

Harlen Chism of Stockton, Missouri, $13,051.50.

Ray and Clara Pinkman of Stockton, Missouri, $7,069.30.

Perrin Masters of Stockton, Missouri, $7,600.

Ray M. Pinkman of Stockton, Missouri, $7,300.

A.W. Spillers of El Dorado Springs, Missouri, $12,215.82.

Hester E. Simrell of Stockton, Missouri, $5,653.91.

G.E. Amick of El Dorado Springs, Missouri, $10,167.

T.M. Montgomery of Stockton, Missouri, $7,500.

T.L. Montgomery of Las Animas, Colorado, $27,000.

T.M. and Berla Montgomery of Stockton, Missouri, $1,000.

A.C. and Virginia Montgomery of Stockton, Missouri, $9,986.

Irene Larson of Aurora, Missouri and Virginia Montgomery of Stockton, Missouri, $18,891.

G.Y. Leffler of Stockton, Missouri, $37,640.

Ruby Dean Leffler of Stockton, Missouri, $37,640.

G.Y. and Ruby Dean Leffler of Stockton, Missouri, $10,354.

Edward C. and Frances Pyle of Stockton, Missouri, $14,132.50.

Gilbert and Ronnie Pyle of Stockton, Missouri, $21,215.

Ronnie and Kay Pyle of Stockton, Missouri, $3,789.25.

Gilbert and Pansy Pyle of Stockton, Missouri, $3,789.25.

Lageta Cowan of Stockton, Missouri, $10,167.

Loy Swangel, Blanche Goddard, Elizabeth McCarthy, and Helen Good of Stockton, Missouri, $18,808.33.

W.H. Eslinger of Stockton, Missouri, $8,698.

J.C. Eslinger of Stockton, Missouri, $8,698.

Max A. and Betty L. Smith of Stockton, Missouri, $665.

Lat and Zella Lee Smith of Stockton, Missouri, $1,222.

Riley and Iva M. Carver of El Dorado Springs, Missouri, $95,000.

Senate Resolution 491 would seek the assistance of the offices of the Chief Commissioner of the U.S. Court of Claims in determining for the Senate the extent and nature of claimants damage claims as contained in S. 3690.

In passing upon the merit of referring S. 3690 to the Chief Commissioner of the U.S. Court of Claims for his report, the committee considered the following facts as contained in a letter dated June 8, 1976, to the chairman by Senator Eagleton on behalf of the claimants and the private relief legislation contained in S. 3690:

Stockton Dam, which is located on the Sac River near Stockton, Missouri, was designed as a multi-purpose project—flood control, hydro-electric, and recreation. Beginning in the winter of 1972, tests of the generator caused extensive flooding in downstream areas. The Corps later acknowledged that the flooding was result of its miscalculation about downstream capacity. Since then, the Corps has limited discharges through the turbine to 5,000 cubic feet per minute or roughly one half of the designed output of the generator and conducted lengthy studies to determine ways of eliminating flood losses. It has now settled on a plan which involves a combination of downstream channelization, purchase of approximately 1300 acres of flowage easements, and permanent reduction of power releases to 8000 cubic feet per minute.

There is no question that the damage caused to property and crops was the result of Corps negligence as attested to by both its public statements and the remedial action it is now pursuing.

Equally persuasive on the merits of the resolution (S.Res.491), calling for referral of S. 3690 to the Chief Commissioner, is the fact as outlined in Senator Eagleton's letter that:

Each of the individuals named in my bill filed claims with the Army Corps of Engineers only to have them denied on the legal ground that the Corps is immune from damages resulting from operation of a multi-purpose project even where negligence is involved. The United States District Court for the Western District of Missouri, Southern Division dismissed a suit filed by the property owners on the same point of sovereign immunity.

The Committee believes that the existence and extent of the Government's liability, if any, to the claimant's arising out of the flooding of their land by the Army Corps of Engineers during the winter of 1972 and the spring of 1973, could most effectively be determined by the offices and resources at the disposal of the Chief Commissioner of the U.S. Court of Claims.

For this reason, the Committee recommends that this resolution receive favorable consideration and agreement by the Senate.

Attached to this report and made a part thereof is the June 5, 1976, letter by Senator Eagleton to this Committee on the bill S. 3531 reintroduced as S. 3690.

U.S. SENATE,
COMMITTEE ON APPROPRIATIONS,
*Washington, D.C., June 8, 1976.*

HON. JAMES EASTLAND,
*Senate Judiciary Committee,*
*Washington, D.C.*

DEAR MR. CHAIRMAN: This week I introduced a bill (S. 3531) directing the Secretary of the Treasury to pay damages to a number of property owners whose land and crops were flooded as a result of releases of water from the Stockton, Missouri, Dam during the winter of 1972 and the spring of 1973. I also introduced a Resolution (S.Res.458) calling for referral of the bill to the United States Court of Claims.

Each of the individuals named in my bill filed claims with the Army Corps of Engineers only to have them denied on the legal ground that the Corps is immune from damages resulting from operation of a multi-purpose project even where negligence is involved. The United States District Court for the Western District of Missouri, Southern Division dismissed a suit filed by the property owners on the same point of sovereign immunity. Equity, however, strongly argues for payment of these claims, witness the following brief account of the facts:

Stockton Dam, which is located on the Sac River near Stockton, Missouri, was de-

signed as a multi-purpose project—flood control, hydro-electric, and recreation. Beginning in the winter of 1972, tests of the generator caused extensive flooding in downstream areas. The Corps later acknowledged that the flooding was result of its miscalculation about downstream capacity. Since then, the Corps has limited discharges through the turbine to 5,000 cubic feet per minute or roughly one half of the designed output of the generator and conducted lengthy studies to determine ways of eliminating flood losses. It has now settled on a plan which involves a combination of downstream channelization, purchase of approximately 1300 acres of flowage easements, and permanent reduction of power releases to 8000 cubic feet per minute.

There is no question that the damage caused to property and crops was the result of Corps negligence as attested to by both its public statements and the remedial action it is now pursuing. Notwithstanding the immunity statute, I believe the property owners damaged as a result of Corps negligence in this case are deserving of compensation for their losses.

I am enclosing a copy of the bill and resolution, as well as supporting documents for Committee use. I would appreciate any consideration you can give this matter.

Sincerely,

THOMAS F. EAGLETON.

**S.Res.491**

Filed Aug. 18, 1976

**In the Senate of the United States,**

*August 9, 1976.*

*Resolved,* That the bill (S. 3690) entitled "A bill for the relief of R. Dean Dawes and others", now pending in the Senate, together with all the accompanying papers, is referred to the Chief Commissioner of the United States Court of Claims; and the Chief Commissioner shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report thereon to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity in the amount, if any, legally or equitably due from the United States to the claimant.

Attest:

*Secretary.*

BEFORE THE CHIEF COMMISSIONER

THE UNITED STATES CLAIMS COURT

G.E. AMICK, ET AL.,

Plaintiffs,

v.

UNITED STATES OF AMERICA

Defendant.

Congressional Reference No. 5–76

PROPOSED FINDINGS OF FACT AND RECOMMENDATION REGARDING ENTRY OF OPINION

The United States recommends, with the concurrence of plaintiffs' counsel, the following findings of fact:

(1) Claimant No. 1, G.E. Amick, has suffered losses in the amount of $3,200.00, which is 31% of his original claim.

(2) Claimant No. 2, Riley Carver, has suffered losses in the amount of $6,800.00, which is 25% of his original claim for property damage.

(3) Claimant No. 3, Harlen Chism has suffered losses in the amount of $6,596.00, which is 50% of his original claim.

(4) Claimant No. 4, Lageta Cowan, has suffered losses in the amount of $3,200.00, which is 31% of her original claim.

(5) Claimant No. 5, R. Dean Dawes, has suffered losses in the amount of $2,700.00, which is 39% of his original claim.

(6) Claimant No. 6, J.C. Eslinger, has suffered losses in the amount of $5,668.00, which is 65% of his original claim.

(7) Claimant No. 7, W.H. Eslinger, has suffered losses in the amount of $5,668.00, which is 65% of his original claim.

(8) Claimant No. 8, Irene Larson and Virginia I. Montgomery, have suffered losses in the amount of $7,796.00 which is 41% of their original claim.

(9) Claimant No. 9, Ruby Dean Leffler, has suffered losses in the amount of $4,982.00, which is 10% of her original claim.

(10) Claimant No. 10, Perrin Masters, has suffered losses in the amount of $2,394.00, which is 31% of his original claim.

(11) Claimant No. 11, A.C. and Virginia I. Montgomery, have suffered losses in the amount of $4,500.00, which is 45% of their original claim.

(12) Claimant No. 12, T.M. Montgomery, has suffered losses in the amount of $3,087.00, which is 41% of his original claim.

(13) Claimant No. 13, T.M. and Berla Montgomery, have suffered losses in the amount of $190.00, which is 19% of their original claim.

(14) Claimant No. 14, Ray M. Pinkman, has suffered losses in the amount of $3,819.00, which is 52% of his original claim.

(15) Claimant No. 15, Ray and Clara Pinkman, have suffered losses in the amount of $4,211.00, which is 60% of their original claim.

(16) Claimant No. 16, Edward C. and Frances Pyle, have suffered losses in the amount of $1,545.00, which is 11% of their original claim.

(17) Claimant Nos. 17 and 19, Gilbert and Pansey Pyle and Ronnie and Kay Pyle, have suffered losses in the amount of $4,422.00, which is 58% of their combined original claims.

(18) Claimant No. 18, Gilbert and Ronnie Pyle, have suffered losses in the amount of $11,458.00, which is 54% of their original claim.

(19) Claimant No. 20, Hester E. Simrell, has suffered losses in the amount of $2,200.00, which is 39% of her original claim.

(20) Claimant No. 21, Lat and Zella Lee Smith, have suffered losses in the amount of $384.00, which is 31% of their original claim.

(21) Claimant No. 22, Max Smith, has suffered losses in the amount of $310.00, which is 47% of his original claim.

(22) Claimant No. 23, N.W. Spillars, has suffered losses in the amount of $3,500.00, which is 29% of his original claim.

(23) Claimant No. 24, Swangel Estate, has suffered losses in the amount of $12,-123.00, which is 64% of its original claim.

(24) The total loss suffered due to the United States behavior was $100,753.00, with an average recovery of 41.5% of the original claim.

Defendant, United States recommends that the Commissioner enter an opinion adopting the above findings of fact regarding the loss suffered by plaintiffs as the total settlement in this action.

Respectfully submitted,

/s/ Lynn Rubinstein

LYNN RUBINSTEIN Attorney
Department of Justice
Washington, D.C. 20530
(202) 633–5397

BEFORE THE CHIEF COMMISSIONER
THE UNITED STATES
CLAIMS COURT

G.E. AMICK, ET AL.,

Plaintiffs,

v.

UNITED STATES OF AMERICA

Defendant.

Congressional Reference No. 5–76

AMENDED PROPOSED FINDINGS OF FACT AND RECOMMENDATION REGARDING ENTRY OF OPINION

Filed Nov. 23, 1983 by leave of the Judge

The United States recommends, with the concurrence of plaintiffs' counsel, the following findings of fact:

(1) Claimant No. 1, G.E. Amick, has suffered losses in the amount of $3,200.00, which is 31% of his original claim.

(2) Claimant No. 2, Riley Carver, has suffered losses in the amount of $6,800.00, which is 25% of his original claim for property damage.

(3) Claimant No. 3, Harlen Chism has suffered losses in the amount of $6,596.00, which is 50% of his original claim.

(4) Claimant No. 4, Lageta Cowan, has suffered losses in the amount of $3,200.00, which is 31% of her original claim.

(5) Claimant No. 5, R. Dean Dawes, has suffered losses in the amount of $2,700.00, which is 39% of his original claim.

(6) Claimant No. 6, J.C. Eslinger, has suffered losses in the amount of $5,668.00, which is 65% of his original claim.

(7) Claimant No. 7, W.H. Eslinger, has suffered losses in the amount of $5,668.00, which is 65% of his original claim.

(8) Claimant No. 8, Irene Larson and Virginia I. Montgomery, have suffered losses in the amount of $7,796.00 which is 41% of their original claim.

(9) Claimant No. 9, Ruby Dean Leffler, has suffered losses in the amount of $4,982.00, which is 10% of her original claim.

(10) Claimant No. 10, Perrin Masters, has suffered losses in the amount of $2,394.00, which is 31% of his original claim.

(11) Claimant No. 11, A.C. and Virginia I. Montgomery, have suffered losses in the amount of $4,500.00, which is 45% of their original claim.

(12) Claimant No. 12, T.M. Montgomery, has suffered losses in the amount of $3,087.00, which is 41% of his original claim.

(13) Claimant No. 13, T.M. and Berla Montgomery, have suffered losses in the amount of $190.00, which is 19% of their original claim.

(14) Claimant No. 14, Ray M. Pinkman, has suffered losses in the amount of $3,819.00, which is 52% of his original claim.

(15) Claimant No. 15, Ray and Clara Pinkman, have suffered losses in the amount of $4,211.00, which is 60% of their original claim.

(16) Claimant No. 16, Edward C. and Frances Pyle, have suffered losses in the amount of $1,545.00, which is 11% of their original claim.

(17) Claimant Nos. 17 and 19, Gilbert and Pansey Pyle and Ronnie and Kay Pyle, have suffered losses in the amount of $4,422.00, which is 58% of their combined original claims.

(18) Claimant No. 18, Gilbert and Ronnie Pyle, have suffered losses in the amount of $11,458.00, which is 54% of their original claim.

(19) Claimant No. 20, Hester E. Simrell, has suffered losses in the amount of $2,200.00, which is 39% of her original claim.

(20) Claimant No. 21, Lat and Zella Lee Smith, have suffered losses in the amount of $384.00, which is 31% of their original claim.

(21) Claimant No. 22, Max Smith, has suffered losses in the amount of $310.00, which is 47% of his original claim.

(22) Claimant No. 23, A.W. Spillars, has suffered losses in the amount of $3,500.00, which is 29% of his original claim.

(23) Claimant No. 24, Swangel Estate, has suffered losses in the amount of $12,-123.00, which is 64% of its original claim.

(24) The total loss suffered due to the United States behavior was $100,753.00, with an average recovery of 41.5% of the original claim.

Defendant, United States recommends that the Commissioner enter an opinion adopting the above findings of fact regard-

ing the loss suffered by plaintiffs as the total settlement in this action.

Respectfully submitted,
/s/ Lynn Rubinstein
LYNN RUBINSTEIN
Attorney
Department of Justice
Washington, D.C. 20530
(202) 633–5397

EXHIBIT A

LAW OFFICES OF

Samuel J. Short, Jr.

October 19, 1983

Ms. Lynn Rubinstein
Attorney
United States Department of Justice
Washington, D.C. 20530

Re: Amick v. United States,
 Congressional Reference No. 5–76

Dear Ms. Rubinstein:

Thank you for forwarding to me your proposed findings of fact that Defendant would like to tender to the Claims Court Commissioner.

The proposed findings of facts meet with the approval of Claimant No. 2, Riley Carver.

Your attention thereto is appreciated.

Very truly yours,
/s/Samuel J. Short, Jr.
Samuel J. Short, Jr.

EXHIBIT B

Phillips & Phillips

Attorneys & Counsellors at Law

Box G

Stockton, Missouri 65785

Joseph B. Phillips
Carol Ann Phillips

November 7, 1983

Lynn Rubinstein
Assistant Attorney General
Land and Natural Resources Div.
U.S. Department of Justice
Washington, D.C. 20530

Re: Amick v. United States,
 Congressional Reference No. 5–76

Dear Ms. Rubenstein:

Thank you for your *Proposed Findings of Fact and Recommendation Regarding Entry of Opinion.*

Mr. Collins and I have reviewed this and have no objections, other than the typographical error on page 3, # 22, which should read "A.W. Spillars", rather than "N.W. Spillars."

Thank you for your continued cooperation.

Very truly yours,
PHILLIPS & PHILLIPS
BY: /s/Joe Phillips

BEFORE THE CHIEF COMMISSIONER
THE UNITED STATES
CLAIMS COURT

G.E. AMICK, ET AL.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Congressional Reference No. 5–76

MEMORANDUM IN SUPPORT OF
PROPOSED FINDINGS OF FACT

Filed Feb. 13, 1984.

INTRODUCTION

By order dated January 30, 1984, this Court requested a memorandum in support of the amended proposed findings of fact submitted by the parties on November 23, 1983. This memorandum will detail defendant's reasons for entering settlement negotiations with plaintiffs and the basis for the proposed settlement figures. It is important to note that no proposed findings of law have been tendered to the Court because the United States is not conceding liability. For equitable reasons the United States has determined that settling this action without litigation is the fairest and wisest use of the Court's and parties' time and financial resources.

In a Congressional reference case under 28 U.S.C. 2509, recovery can be had where it is "equitable," in a broad sense, to do so. The Army Corps of Engineers clearly made an error in estimating channel capacity for the Stockton Lake project which resulted in flooding of downstream riparian land. Under legal principles plaintiffs are not entitled to recover. Because they clearly have suffered harm due to Corps error, the equities indicate that some recovery is appropriate.

## STATEMENT

Plaintiffs hold various interests in agricultural land downstream of Stockton Lake, Missouri. By S. 3690, 94th Cong., 2d Sess. (July 22, 1976), the Senate referred plaintiffs' flooding damage claims to the Chief Commissioner of the Court of Claims (now the United States Claims Court) for a recommendation. The recovery period for which Congress has referred the claim is between November, 1972, and June, 1974.

Stockton Lake, Missouri, is a multi-purpose project authorized under the Flood Control Act of 1954, Pub.L. No. 83-780, 83d Congress. Its purposes include flood control and hydroelectric power generation. Stockton Dam is located at river mile 51.6 of the Sac River. Pre-construction design estimates for the Stockton Dam overestimated the channel capacity of the Sac River downstream from the dam in certain areas. Specifically, those pre-construction design estimates measured downstream capacity at 12,000 cfs. In fact, in certain areas channel capacity and overflow—i.e., flooding—occurred at flows between 5,000-5,300 cfs. The Corps of Engineers has now acknowledged, publicly and officially, this mistake in its design calculations.

On the basis of the over-estimate, the Corps installed a 52,000 kilowatt hydroelectric generating unit at the Stockton Dam. Generation, at overload capacity, from a generator of that size would result in discharges of up to 11,000 cfs.—substantially in excess of channel capacity. From November 3, through November 12, 1972, the Corps began its initial operational period for the hydroelectric unit. Because of the overestimate of channel capacity, the Dam's early test discharge releases caused flooding. Those releases were terminated when incoming complaints made it clear that downstream flooding was occurring. Later, between November 22 and November 24, 1972, discharges were again increased to determine the scope of the downstream flooding. Complaints followed and the tests were ended.

## STANDARDS

As a Congressional reference suit, proceedings in *Amick* are defined by 28 U.S.C. 2509. Under that statute, the Commissioner of the Claims Court is to report:

conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.

Under a legal taking analysis, plaintiffs' claims should fail. To the extent damages may have, *arguendo,* been occasioned by the November, 1972, release plaintiffs would fail to prove the element of inevitably recurring floods necessary for a Fifth Amendment claim. *Bartz v. United States,* 412 F.2d 1192 (Ct.Cl.1979); *B. Amusement Company v. United States,* 180 F.Supp. 386 (Ct.Cl.1960); *North Counties Hydroelectric Co. v. United States,* 70 F.Supp. 900 (Ct.Cl.1947). Defendant would also argue that any slight damages which may, *arguendo,* have been incurred by plaintiffs were countervailed by benefits to plaintiffs and the public provided by Stockton Dam after 1972. *Bartz, supra; Ark-Mo Farms v. United States,* 530 F.2d 1384 (Ct.Cl.1976); *United States v. Sponenberger,* 308 U.S. 256 (1939).

Under a legal tort analysis, plaintiffs' claims would also likely fail. "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. 702c. Assuming that the mistake in measurement of channel capacity and the resulting excess in design capacity for Stockton Dam reflected a failure of due

care, 33 U.S.C. 702c has been held to preclude recovery even from negligence in design or construction. *Spillway Marina, Inc. v. United States,* 445 F.2d 876 (10th Cir.1971).

The exposure to recovery in *Amick,* however, is not resolved by answering the question of legal liability. By its terms, 28 U.S.C. 2509 requires that Congress be advised whether the claimant has an "equitable" claim. In *Phillips v. United States,* 207 Ct.Cl. 924, 929 (1975), the Trial Commissioner offered the following analysis:

In *Burkhardt v. United States,* 113 Ct.Cl. 658, 667, 84 F.Supp. 553, 559 (1949), the court expressed the "opinion that the term 'equitable claim' as used in 28 U.S.C., Sec. 2509, is not used in a strict technical sense meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon general equitable considerations." The very significance of the concept thus described is that it permits going beyond the rules of law, and applying "equity" in its broad sense. (Citations omitted).

Generally, such equitable relief rests on an unjustified act or omission which harmed plaintiff. *Clarkton v. United States,* 194 Ct.Cl. 963 (1961). Indeed, some cases have found an "equitable claim" even without such an "unjustified act or omission." *Ghitescu v. United States,* 201 Ct.Cl. 823, 837–83 (1973); *Rumley v. United States,* 169 Ct.Cl. 100, 103 (1965).

## BASIS FOR THE PROPOSED FINDINGS OF FACT

Given the "equitable claim" element of recovery, it is probable that plaintiffs would recover for those provable 1972 losses. A conscious government release policy based on mistaken channel capacity estimates caused substantial downstream flooding, a fact which the Corps does not dispute. Moreover, original channel capacity estimates were based on a limited sampling of measurements. In these circumstances, the Commissioner could find an "equitable" claim for the 1972 damages.

Corps maintained log books indicate that in 1973 the Stockton power plant was operated at a restricted capacity due to the possibility of flooding downstream in recognition of the 1972 experience. At its highest, the flood pool elevation in 1973 reached 72% of capacity. Nonetheless, releases of flood control pool waters on March 23, April 19, 20, 28–30, May 1–30, and June 1–29, 1973, were made in excess of the downstream channel capacity. Overflow occurred when releases exceeded roughly 5,000 cfs. For the specific period from April 28 to June 29, for instance, most releases varied from 6,100 to 7,400 cfs. Many of these releases were short term peaking releases, designed to assess the extent of downstream flooding in certain power generation configurations. These occasioned some downstream flooding, accelerated natural erosion, and were made when 28% of the flood pool remained.

Release operations for the Corps are discretionary and, unless shown to be arbitrary, will not normally give rise to legal liability. Here, however, the 1973 overbank releases were made when over one-fourth of the flood pool storage remained and were made to assess the impact of the newly discovered channel constraint on power generation. They could easily be viewed as experimentation by the Corps to assess the impact of the mistake in channel capacity discovered in 1972. Hence, under an equitable claim analysis, sufficient risk exists that the 1973 releases would be linked to those of 1972 to warrant a reasonable settlement allowance for the 1973 claims.*

As a result of these factors, settlement seems the best compromise. Settlement, in this context, means an agreement on behalf of the United States to stipulate to certain recommended recoveries for plaintiffs in

---

* To the best of our knowledge, there was no flooding damage as the result of excess releases in 1974.

exchange for plaintiffs' abandonment of the remainder of their claims. The settlement does not include an admission of liability by the United States.

## SETTLEMENT FIGURES

The recommended recovery, reached after settlement discussions between the parties, is for $100,753.00 of plaintiffs' total claim of $341,502.86. A more specific breakdown of the settlement by plaintiff is found in the amended proposed findings of fact filed with the Court on November 23, 1983.

## CONCLUSION

Defendant offers the foregoing reasons as the basis for an equitable settlement of this claim for the amount specified in the amended proposed findings of fact.

Respectfully submitted,
/s/Lynn Rubinstein
LYNN RUBINSTEIN
Attorney
Department of Justice
Washington, D.C. 20530
(202) 633-5397

BEFORE THE CHIEF COMMISSIONER
THE UNITED STATES
CLAIMS COURT

G.E. AMICK, ET AL.

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Congressional Reference No. 5-76
CONCURRENCE IN MEMORANDUM IN
SUPPORT OF PROPOSED
FINDING OF FACT

Filed April 13, 1984, by leave of
the Judge

Comes now Joseph B. Phillips, Attorney for all Plaintiffs, except Plaintiff # 2, and concurs in the memorandum filed on February 13th, 1984, by the Government-Defendant herein, and requests the Court to enter Judgment in accordance therewith.

Respectfully submitted,
PHILLIPS & PHILLIPS
By: /s/Joseph B. Phillips
 Joseph B. Phillips
 Mo. Bar I.D. # 21989
 P.O. Box "G"
 Stockton, Missouri 65785
 Tel.: 417-276-4810
Attorney for all Plaintiffs,
except Plaintiff # 2.

BEFORE THE CHIEF COMMISSIONER
THE UNITED STATES
CLAIMS COURT

G.E. AMICK, ET AL.,

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.

Congressional Reference No. 5-76
AMENDED CONCURRENCE IN MEMORANDUM IN SUPPORT OF PROPOSED FINDING OF FACT

Filed April 24, 1984, by leave of
the Judge

Comes now Samuel J. Short, Jr., Attorney for Plaintiff No. 2, and concurs in the memorandum filed on February 13, 1984, by the Government-defendant herein, and requests the Court to enter judgment in accordance therewith.

Respectfully submitted,
SAMUEL J. SHORT, JR.
By: /s/Samuel J. Short, Jr.
 Missouri Bar I.D. No. 19847,
 101 Public Square
 Stockton, Missouri 65785
 Telephone: 417-276-3900
Attorney for Plaintiff No. 2